WILLIAM M. HAKE (SBN 110956)
Bill.Hake@wilsonelser.com
NICOLAS P.MARTIN (SBN 267708)
Nick.Martin@wilsonelser.com
VINCENT ADAMS (SBN 249696)
Vincent.Adams@wilsonelser.com
KENDRA TIETJEN (SBN 312044)
Kendra.Tietjen@wilsonelser.com
**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP**
525 Market St., 17th Floor
San Francisco, CA 94105
Tel.: (415) 433-0990
Fax: (415) 434-1370

Attorneys for Defendant
HONEYWELL INTERNATIONAL, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

Sections 331

| | |
|---|---|
| VICTOR HALFON and KAREN HALFON,<br><br>Plaintiffs,<br><br>vs.<br><br>PARKER-HANNIFIN CORPORATION, et al.<br><br>Defendants. | CASE NO.:<br><br>**NOTICE OF REMOVAL TO FEDERAL COURT PURSUANT TO 28 U.S.C. §1441(a)(1) (FEDERAL ENCLAVE) and §1442 (a)(1) (FEDERAL OFFICER)** |

**TO THE HONORABLE COURT, CLERK, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that Defendant Honeywell International Inc. ("Honeywell"), by and through undersigned counsel, hereby gives notice of the removal of Civil Case No. CGC-18-276754 from the Superior Court of the State of California, San Francisco County, to the United States District Court for the Northern District of California, pursuant to 28 U.S.C. §§ 1441, 1442, 1331 and 1446. Removal of this action is proper for the following reasons set forth below.

///

## I. PROCEDURAL HISTORY & BACKGROUND

1. This case is properly removable to this Court pursuant to 28 U.S.C. § 1441 and § 1442 because the removing party has satisfied the procedural requirements for removal as set forth in 28 U.S.C. § 1446, and this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

2. Venue is proper in this Court under 28 U.S.C. § 1441 because the Superior Court for the State of California, San Francisco County, is located within the Northern District of California.

3. This Notice of Removal is being filed with this Court within thirty (30) days after Defendant was served with a copy of the initial pleading in this action, and thus removal is timely pursuant to 28 U.S.C. § 1446(b).

4. Under 28 U.S.C. § 1446(d), on the date set forth below, written notice of this removal will be served upon Plaintiffs' counsel. Also, a copy of the notice will be filed with the clerk of the Superior Court for the State of California, San Francisco County, where the state court action was commenced.

5. Pursuant to 28 U.S.C. § 1446(a), a copy of all process, pleadings, and orders served upon Defendant and filed with the Court in the above-entitled action are attached as **Exhibit A** to this notice.

6. On or about December 18, 2018, Plaintiffs, Victor Halfon ("Plaintiff") and Karen Halfon, (collectively "Plaintiffs"), commenced an action against six defendants: Honeywell International, Inc., Hopeman Brothers, Inc., J.T. Thorpe & Son Inc., Crown Cork & Seal Company Inc., Metropolitan Life Insurance Company, and Parker-Hannifin Corporation by filing a Complaint that was assigned Case No. CGC-18-276754 in the Superior Court for the State of California, San Francisco County.

7. Honeywell International, Inc. ("Defendant" or "removing party") is a Defendant in the above titled state action, and on December 27, 2018, at 12:26 p.m., was personally served with a Summons and "*Complaint for Personal Injuries and Loss of Consortium – Asbestos*" at 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833. Plaintiffs filed the Proof of Service of Summons thereafter with the court on or about January 15, 2019. A copy of the Summons and Complaint is included in attachment hereto as "**Exhibit A.**"

8. The face of the Complaint identifies six (6) Defendants in the state court action: Crown Cork & Seal Company, Inc., Hopeman Brothers, Inc. Honeywell International Inc., J.T. Thorpe & Son Inc., Metropolitan Life Insurance Company, and Parker-Hannifin Corporation. (**Exhibit A**, Complaint, at P. 1). However, as of January 28, 2019, proof of service of summons had only been filed with the Court reflecting service upon four (4) Defendants: Honeywell International Inc., J.T. Thorpe & Son Inc., Metropolitan Life Insurance Company, and Parker-Hannifin Corporation. (**Exhibit A**, Proof of Service for all Defendants filed with the State Court to date). As required by 28 U.S.C. § 1441(b)(1), the four (4) Defendants identified above that have been properly served have consented to the removal of the action on the grounds stated within this Notice of Removal. *Busby v. Capital One, N.A.*, 932 F. Supp. 2d 114, 127 (D.D.C. 2013). (Explaining "three well-established exceptions exist to this rule of unanimity: 1) where one or more defendants has not been served with the initial pleading at the time the removal petition was filed").

9. Plaintiffs' Complaint alleges various causes of action for Negligence, Products liability, Concert of Action, and Fraud, against six (6) Defendants' products and/or employees.[1] Plaintiffs allege that Mr. Halfon was exposed to "asbestos, and asbestos containing products"

---

[1] In undertaking this analysis, Honeywell does not concede the truth of any of the allegations set forth in the Complaint. Thus, all paragraphs and provisions contained herein are adversarial in nature, operate under all necessary assumptions and presumptions, and are set forth for the limited purpose of removing said matter to Federal Court.

throughout his employment for the United States Navy beginning in 1961 through 1974 and as a result of these claimed exposures from Defendants' products and equipment developed mesothelioma. (**Exhibit A**, Complaint at Pp. 55-56).

10. Plaintiffs' allegations as identified in the Complaint stem solely from Plaintiff's employment by the United States Navy while working at Naval Shipyards including Long Beach Naval Shipyard, Mare Island, and Hunters Point, all of which are United States Naval Facilities, in addition to many other Naval facilities including bases in California, Virginia, and Florida. (**Exhibit A**, Complaint, at Pp. 55-56). Plaintiffs' Complaint makes it clear that almost all of Plaintiff's exposure to asbestos occurred during Plaintiff's' work while on board United States Navy ships and working at United States Naval facilities. (*Id.*).

## II. JURISDICTION

11. Pursuant to ND CA Rule 3- 5(a) and 28 USC §1446(a) the basis for federal jurisdiction is set forth below.

*A. Federal Enclave Jurisdiction*

12. This court has federal question subject matter jurisdiction under 28 U.S.C. § 1331(a) which provides that federal courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." The Ninth Circuit has held that personal injury actions arising from incidents occurring on "federal enclaves" invoke federal question jurisdiction under § 1331 because the issue "arises under" the Constitution. 28 USC § 1331; U.S. Const. art. 1, s 8, cl. 17 ("The Congress shall have power…(t)o exercise exclusive legislation…over all places purchased by the consent of the legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards…"). The Constitution's provision that Congress shall have power "[t]o exercise exclusive Legislation," has been construed to mean exclusive jurisdiction under 28 U.S.C. §1331. *Mater v. Holley*, 200 F.2d 123, 124-125

(5th Cir. 1952).

13. The allegations contained in Plaintiffs' Complaint stem solely from Plaintiff's employment by the United States Navy. The Complaint identifies that the work and exposure allegedly causing Plaintiff's injuries while employed for the U.S. Navy occurred while Plaintiff was working at Treasure Island Naval Base, Long Beach Naval Shipyard, Mare Island Naval Shipyard, as well as other Naval facilities and while on board United States Navy ships docked at these federally owned enclaves. (**Exhibit A**, Complaint, at Pp. 55-56). *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (2006); *Willis v. Craig*, 555 F.2d 724, 726 (9th Cir. 1977).

14. Long Beach Naval Shipyard, amongst other shipyard and bases where Plaintiff is claiming exposure are federal enclaves having been acquired by the Department of Navy based upon recorded deeds. Since Plaintiff claims he was injured while working on property recognized as federal enclaves, the claims "arise under" the laws of the United States within the meaning of 28 U.S.C. §1331 and render removal under 28 U.S.C. §1442(a)(1) to federal court proper. *See Fung v. Abex Corp.*, 816 F. Supp. 569 (1992); U.S. Const. art. 1, s 8, cl. 1.

15. As required under §1441, consent to join in the removal of this action to the United States District Court for the Northern District of California has been obtained from the four (4) Defendants served to date in this matter: J.T. Thorpe & Son Inc., Metropolitan Life Insurance Company, and Parker-Hannifin Corporation. (See ¶ 8 above).

*B. Federal Officer Jurisdiction*

16. Removal of this case is also proper pursuant to 28 U.S.C. § 1442(a)(1) as this is a civil action commenced in a state court against the United States or agency thereof, or any officer *(or any person acting under that officer)* of the United States or any agency thereof, sued in an official or individual capacity for any act under color of such office. 28 U.S.C. § 1442 (emphasis added); *Colorado v. Symes,* 286 US 510, 517 (1932); (Holding that the right to removal is

"absolute for conduct performed 'under color' of federal office"); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247 (2006) ("when federal officers and their agents are seeking a federal forum, we are to interpret §1442 broadly in favor of removal"). Removal under § 1442 does not require consent of all Defendants in a lawsuit. *Ely Valley Mines, Inc. v. Hartford Accident & Indem. Co.*, 644 F.2d 1310, 1315 (9th Cir. 1981); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247 (2006).

17. Removal pursuant to § 1442(a)(1) is appropriate where its demonstrated that the removing party: (1) acted under the direction of a federal officer, (2) raises a colorable federal defense to plaintiff's claims, and (3) demonstrates a causal nexus between plaintiff's claims and acts it performed under color of federal office. "Honeywell" is a "person" within the meaning of 28 U.S.C. § 1442(a)(1); *See Fung v. Apex Corp.*, 816 F.Supp. 569, 572 (N.D. Cal. 1992) (finding that a corporate defendant was a "person").

18. The alleged actions attributed to Defendants, as stated in Plaintiffs' Complaint, were performed under the direction, control, or supervision of the Secretary of Navy and its officers. The Navy exercised direct and detailed control over the work done by Defendants under federal contracts and on federal enclaves, satisfying the "acting under" requirement of §1442(a)(1). Additionally, Defendant will assert a colorable federal defense, because some work performed on these military bases and work activities/contracts/agreements with the U.S. Navy are protected by the federal contractor immunity defense as stated in *Boyle v United Technology's. Durham v Lockheed Martin Corp.*, 445 F.3d 1247 (2006). Lastly, there is a causal nexus between Plaintiffs' claims and acts it performed under color of federal office. *Fung v Abex Corp.*, 816 F. Supp. 569 (1992); *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247 (2006).

///

///

///

19. WHEREFORE, based on the foregoing, Defendant respectfully removes this action from the Superior Court for the State of California, San Francisco County, to this Court.

Dated: January 28, 2019

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

By: ______________________

Bill Hake, Esq.
Nick Martin, Esq.
Vincent Adams, Esq.
Kendra Tietjen, Esq.
Attorneys for Defendant
HONEYWELL INTERNATIONAL, INC.



**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SAN FRANCISCO**

# Document Scanning Lead Sheet

Dec-18-2018 12:35 pm

Case Number: CGC-18-276754

Filing Date: Dec-18-2018 12:32

Filed by: ROSSALY DELAVEGA

Image: 06615610

COMPLAINT

VICTOR HALFON ET AL VS. PARKER-HANNIFIN CORPORATION

001C06615610

**Instructions:**
Please place this sheet on top of the document to be scanned.

CM-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, state bar number, and address):
DAVID R. DONADIO, ESQ., STATE BAR NO. 154436
BRAYTON❖PURCELL LLP
222 Rush Landing Road
Novato, California 94948-6169
TELEPHONE NO.: (415) 898-1555 FAX NO.: (415) 898-1247
ATTORNEY FOR (NAME): Plaintiff(s)

FOR COURT USE ONLY

FILED
San Francisco County Superior Court
DEC 10 2018
CLERK OF THE COURT
BY: [signature]
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME:

CASE NAME:
VICTOR HALFON and KAREN HALFON vs. PARKER-HANNIFIN CORPORATION, et al.

## CIVIL CASE COVER SHEET

☒ Unlimited (Amount demanded exceeds $25,000)
☐ Limited (Amount demanded is $25,000 or less)

Complex Case Designation
☐ Counter ☐ Joinder
Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

CASE NUMBER: CGC-18-276754
JUDGE:
DEPT.:

*Items 1-6 below must be completed (see instructions on page 2).*

1. Check one box below of the case type that best describes this case:

**Auto Tort**
- ☐ Auto (22)
- ☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- ☒ Asbestos (04)
- ☐ Product Liability (24)
- ☐ Medical malpractice (45)
- ☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- ☐ Business tort/unfair business practice (07)
- ☐ Civil rights (08)
- ☐ Defamation (13)
- ☐ Fraud (16)
- ☐ Intellectual property (19)
- ☐ Professional negligence(25)
- ☐ Other non-PI/PD/WD tort (35)

**Employment**
- ☐ Wrongful termination (36)
- ☐ Other employment (15)

**Contract**
- ☐ Breach of contract/warranty (06)
- ☐ Rule 3.740 collections (09)
- ☐ Other Collections (09)
- ☐ Insurance coverage (18)
- ☐ Other contract (37)

**Real Property**
- ☐ Eminent domain/Inverse condemnation (14)
- ☐ Wrongful eviction (33)
- ☐ Other real property (26)

**Unlawful Detainer**
- ☐ Commercial (31)
- ☐ Residential (32)
- ☐ Drugs (38)

**Judicial Review**
- ☐ Asset forfeiture (05)
- ☐ Petition re: arbitration award (11)
- ☐ Writ of mandate (02)
- ☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
- ☐ Antitrust/Trade regulation (03)
- ☐ Construction defect (10)
- ☐ Mass tort (40)
- ☐ Securities litigation (28)
- ☐ Environmental / Toxic tort (30)
- ☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- ☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- ☐ RICO (27)
- ☐ Other complaint (*not specified above*) (42)

**Miscellaneous Civil Petition**
- ☐ Partnership and corporate governance (21)
- ☐ Other petition (*not specified above*) (43)

2. This case ☒ is ☐ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   - a. ☒ Large number of separately represented parties
   - b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   - c. ☐ Substantial amount of documentary evidence
   - d. ☐ Large number of witnesses
   - e. ☐ Coordination and related actions pending in one or more courts in other counties, states or countries, or in a federal court
   - f. ☐ Substantial post-judgment judicial supervision
3. Remedies sought (check all that apply): a. ☒ monetary b. ☐ nonmonetary; declaratory or injunctive relief c. ☒ punitive
4. Number of causes of action (*specify*): 8
5. This case ☐ is ☒ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (*You may use form CM-015.*)

Date: 12/18/18
David R. Donadio
(TYPE OR PRINT NAME)

► [signature]
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

NOTICE
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet shall be used for statistical purposes only.

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

CIVIL CASE COVER SHEET

Cal Rules of Court, rules 2.30, 3.220, 3.400-3.403, 3.740
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov
LexisNexis® Automated California Judicial Council Forms

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/ Wrongful Death
- Product Liability *(not asbestos or toxic/environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice– Physicians & Surgeons
  - Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease
    - Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/ Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collection Case–Seller Plaintiff
  - Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition Re: Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
  - Confession of Judgment *(non-domestic relations)*
  - Sister State Judgment
  - Administrative Agency Award *(not unpaid taxes)*
  - Petition/Certification of Entry of Judgment on Unpaid Taxes
  - Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only
  - Injunctive Relief Only *(non-harassment)*
  - Mechanics Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition

**SUM-100**

# SUMMONS
# (CITACION JUDICIAL)

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
PARKER-HANNIFIN CORPORATION
AND **SEE ATTACHED LIST.**

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
VICTOR HALFON and KAREN HALFON

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

**¡AVISO!** Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

The name and address of the court is:
(*El nombre y dirección de la corte es*):
SAN FRANCISCO COUNTY SUPERIOR COURT
400 McAllister Street
San Francisco, CA 94102

CASE NUMBER: (Número del Caso): CGC-18-276754

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección de teléfono del abogado del demandante, o del demandante que no tien abogado, es):
DAVID R. DONADIO, ESQ., STATE BAR NO. 154436
BRAYTON❖PURCELL LLP
222 Rush Landing Road, Novato, CA 94948-6169
Fax No.: (415) 898-1247
Phone No.: (415) 898-1555

DATE: (*Fecha*) DEC 1 8 2018 CLERK OF THE COURT Clerk, by (*Secretario*) DE LA VEGA-NAVARRO, Rossaly , Deputy (*Adjunto*)

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL] SUPERIOR COURT OF CALIFORNIA COUNTY OF SAN FRANCISCO

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:
3. ☐ on behalf of *(specify)*:

under: ☐ CCP 416.10 (corporation) ☐ CCP 416.60(minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association of partnership) ☐ CCP 416.90 (authorized person)
☐ other (specify):

4. ☐ by personal delivery on (date):

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev.July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

*LexisNexis® Automated California Judicial Council Forms*

SUM-200(A)

| SHORT TITLE: VICTOR HALFON and KAREN HALFON v. PARKER-HANNIFIN CORPORATION, et al. | CASE NUMBER: |
|---|---|

## INSTRUCTIONS FOR USE

- ▶ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
- ▶ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** (*Check only one box. Use a separate page for each type of party.*):

☐ Plaintiff ☒ Defendant ☐ Cross-Complainant ☐ Cross-Defendant

CROWN CORK & SEAL COMPANY, INC.;
METROPOLITAN LIFE INSURANCE COMPANY;
HONEYWELL INTERNATIONAL INC. (FOR HONEYWELL CONTROLS);
HOPEMAN BROTHERS, INC.;
J.T. THORPE & SON, INC.;
and DOES 1 through 800, inclusive, as required by California law on joint and several liability pursuant to California Civil Code § 1431.2 enacted by the People of the State of California.

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

*LexisNexis® Automated California Judicial Council Forms*

ALAN R. BRAYTON, ESQ., S.B. #73685
DAVID R. DONADIO, ESQ., S.B. #154436
DDonadio@braytonlaw.com
JAMES P. NEVIN, ESQ., S.B. #220816
NANCY T. WILLIAMS, ESQ., S.B. #201095
BRAYTON❖PURCELL LLP
Attorneys at Law
222 Rush Landing Road
P.O. Box 6169
Novato, California 94948-6169
(415) 898-1555

Attorneys for Plaintiffs

FILED
San Francisco County Superior Court
DEC 18 2018
CLERK OF THE COURT
BY: [signature] Deputy Clerk

BRAYTON❖PURCELL LLP
ATTORNEYS AT LAW
222 RUSH LANDING ROAD
P O BOX 6169
NOVATO, CALIFORNIA 94948-6169
(415) 898-1555

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

VICTOR HALFON and KAREN HALFON,

Plaintiffs,

vs.

PARKER-HANNIFIN CORPORATION; CROWN CORK & SEAL COMPANY, INC.; METROPOLITAN LIFE INSURANCE COMPANY; HONEYWELL INTERNATIONAL INC. (FOR HONEYWELL CONTROLS); HOPEMAN BROTHERS, INC.; J.T. THORPE & SON, INC.; and DOES 1 through 800, inclusive, as required by California law on joint and several liability pursuant to California Civil Code § 1431.2 enacted by the People of the State of California,

Defendants.

**ASBESTOS**
No. CGC-18-276754

COMPLAINT FOR PERSONAL INJURY AND LOSS OF CONSORTIUM - ASBESTOS

(Pursuant to Case Management Order, Filed June 29, 2012)

Index of Causes of Action:

1. Negligence I
2. Products Liability
3. Negligence II
4. Aiding and Abetting Battery [Against Metropolitan Life Insurance Company and Does 750-790, Inclusive]
5. Concert of Action
6. Fraud and Deceit/Concealment
7. Fraud and Deceit/Intentional Misrepresentation
8. Loss of Consortium

FIRST CAUSE OF ACTION
(Negligence I)

PLAINTIFF VICTOR HALFON COMPLAINS OF DEFENDANTS HEREIN BELOW NAMED, THEIR "ALTERNATE ENTITIES" AND EACH OF THEM, FOR A CAUSE OF ACTION FOR NEGLIGENCE I, PURSUANT TO CIVIL CODE § 1714, BAJI 3.00, 3.10, 3.11,

3.12, 3.76, 3.77, 3.78, 9.19, 9.20, 9.21, AND CACI 400, 401, 431, 435, 1220, 1221, 1222, 1223, AND ALLEGES:

1. The true names and capacities, whether individual, corporate, associate, governmental or otherwise, of defendants DOES 1 through 300, inclusive, are unknown to plaintiff at this time, who therefore sues said defendants by such fictitious names. When the true names and capacities of said defendants have been ascertained, plaintiff will amend this complaint accordingly. Plaintiff is informed and believes, and thereon alleges, that each defendant designated herein as a DOE is responsible, negligently or in some other actionable manner, for the events and happenings hereinafter referred to, and caused injuries and damages proximately thereby to the plaintiff, as hereinafter alleged.

2. At all times herein mentioned, each of the defendants was the agent, servant, employee and/or joint venturer of his co-defendants, and each of them, and at all said times, each defendant was acting in the full course and scope of said agency, service, employment and/or joint venture.

3. Plaintiff is informed and believes, and thereon alleges that at all times herein mentioned, defendants: PARKER-HANNIFIN CORPORATION; CROWN CORK & SEAL COMPANY, INC.; METROPOLITAN LIFE INSURANCE COMPANY; HONEYWELL INTERNATIONAL INC. (FOR HONEYWELL CONTROLS); HOPEMAN BROTHERS, INC.; J.T. THORPE & SON, INC.; and DOES 1 through 300, inclusive, were individuals, or corporations, partnerships and/or unincorporated associations organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction, and that said defendants, and each of them, were and are authorized to do and are doing business in the State of California, and that said defendants have regularly conducted business in the County of San Francisco, State of California.

4. At all times herein mentioned, each of the named defendants and DOES 1 through 300 was the successor, successor in business, successor in product line or a portion thereof, assign, predecessor, predecessor in business, predecessor in product line or a portion thereof, parent, subsidiary, wholly or partially owned by, or the whole or partial owner of or member in

an entity researching, studying, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, rebranding, manufacturing for others, packaging and advertising a certain substance, the generic name of which is asbestos and other products containing said substance. Said entities shall hereinafter collectively be called "alternate entities." Each of the herein named defendants is liable for the tortious conduct of each successor, successor in business, successor in product line or a portion thereof, assign, predecessor in product line or a portion thereof, parent, subsidiary, whole or partial owner, or wholly or partially owned entity, or entity that it was a member of, or funded, that researched, studied, tested, manufactured, fabricated, designed, modified, labeled, assembled, distributed, promoted, leased, bought, offered for sale, recommended for use, supplied, sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted, evaluated, rebranded, manufactured for others and advertised a certain substance, the generic name of which is asbestos and other products containing said substance. The following defendants, and each of them, are liable for the acts of each and every "alternate entity," and each of them, in that there has been a virtual destruction of plaintiff's remedy against each such "alternate entity"; defendants, and each of them, have acquired the assets, product line, or a portion thereof, of each such "alternate entity"; such "alternate entity"; defendants, and each of them, caused the destruction of plaintiff's remedy against each such "alternate entity"; each such defendant has the ability to assume the risk-spreading role of each such "alternate entity"; and that each such defendant enjoys the goodwill originally attached to each such "alternate entity."

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
| PARKER-HANNIFIN CORPORATION | SACOMO-SIERRA, INC.<br>SACOMO MANUFACTURING COMPANY<br>E.I.S. AUTOMOTIVE CORPORATION<br>CONDREN CORPORATION, THE<br>PARKER SEAL COMPANY<br>DENISON HYDRAULICS INC.<br>GREER HYDRAULICS CORPORATION<br>PARKER PACKING CO. |
| CROWN CORK & SEAL COMPANY, INC. | MUNDET CORK COMPANY |

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
| HONEYWELL INTERNATIONAL, INC. (for HONEYWELL CONTROLS) | HONEYWELL, INC.<br>HONEYWELL CONTROLS<br>ALLIEDSIGNAL, INC.<br>AIRESEARCH DOMESTIC INTERNATIONAL SALES CORPORATION<br>ALLIED-SIGNAL, INC.<br>ALLIED CORPORATION<br>ALLIED CHEMICAL CORPORATION<br>GENERAL CHEMICAL CORPORATION<br>FRAM<br>FRICTION MATERIALS OF LOS ANGELES<br>NORTH AMERICAN REFRACTORIES COMPANY<br>EM SECTOR HOLDINGS INC.<br>UNIVERSAL OIL PRODUCTS COMPANY<br>BOYLSTON CORPORATION<br>EHRHART & ASSOCIATES, INC.<br>EHRHART & ARTHUR, INC.<br>GARRETT AIR RESEARCH CORP.<br>STANLEY G. FLAGG & CO.<br>MERGENTHALER LINOTYPE COMPANY<br>ELTRA CORPORATION<br>BUNKER RAMO-ELTRA CORPORATION<br>UNION TEXAS NATURAL GAS CORPORATION<br>UNION OIL AND GAS OF LOUISIANA<br>UNION SULPHUR AND OIL CORPORATION<br>UNION SULPHUR COMPANY, INC., THE<br>MINNEAPOLIS-HONEYWELL REGULATOR COMPANY<br>SIGNAL COMPANIES, INC., THE<br>HANCOCK OIL COMPANY<br>BARRETT DIVISION, ALLIED CHEMICAL & DYE CORPORATION<br>SIGNAL OIL & GAS CO.<br>BANKLINE OIL COMPANY<br>HONEYWELL AVIATION |
| HOPEMAN BROTHERS, INC. | HOPEMAN BROTHERS MARINE INTERIORS, LLC |
| J.T. THORPE & SON, INC. | THE THORPE COMPANY<br>THORPE PRODUCTS CO.<br>J.T. THORPE NORTHWEST |

5. At all times herein mentioned, defendants, their "alternate entities," and each of them, were and are engaged in the business of mining, processing, sorting, researching, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, removing, manipulating, testing, disturbing, contracting for installation, repairing, marketing, warranting,

///

rebranding, manufacturing for others, packaging and/or advertising a certain substance, the generic name of which is asbestos and other products containing said substance.

6.     There is general agreement among scientists, health care providers, physicians, and health and science related agencies and organizations, including but not limited to, the World Health Organization, International Agency for Research on Cancer, American Cancer Society, National  Cancer Institute, National Toxicology Program, Environmental Protection Agency, American Thoracic Society, Occupational Safety and Health Administration, Consumer Products Safety Commission, and the Unites States Congress that exposure to any asbestos type can increase the risk of disease, including but not limited to sub-clinical pleural, lung, and other organ scarring, cancer, mesothelioma, and non-malignant lung and pleural disorders.  Evaluation of all available human data provides no evidence for a "safe" level of asbestos exposure below which risk of clinical disease is not increased.  The mainstream scientific and medical community is in consensus that exposure to asbestos at current regulatory levels results in excess incidence of mesothelioma and that any occupational or para-occupational exposure to asbestos - even that described as low-level or brief in duration must be regarded as causal in an individual with clinical mesothelioma.  "The victim ultimately suffocates from the tumor."  Hernandez v. Amcord, Inc., 215 Cal.App.4th 659, 664.  A rigorous review of the epidemiologic evidence confirms that all types of asbestos fibre are causally implicated in the development of various diseases and premature death.  Numerous well respected international and national scientific organizations, through an impartial and rigorous process of deliberation and evaluation, have concluded that all forms of asbestos are capable of inducing mesothelioma, lung cancer, asbestosis and other diseases.  These conclusions are based on the full body of evidence, including the epidemiology, toxicology, industrial hygiene, biology, pathology, and other related literature published to the time of the respective evaluations.  Since the 1960s, the scientific evidence has become overwhelming that occupational and environmental exposure to asbestos can cause asbestosis, lung cancer, and mesothelioma.  A large number of studies have reported an excess of mesothelioma and lung cancer among  workers who were predominantly exposed to chrysotile asbestos (Kanarek, 2011).  For example, excess mortality from lung cancer and

mesothelioma has been reported among miners and millers in Quebec (Liddell, et al., 1997), among textile workers in South Carolina (Hein, et al., 2007) and North Carolina (Loomis, et al., 2009), Chinese chrysotile production workers (Wang, et al., 2012), and in Italian miners (Pira, et al., 2009) exposed primarily to chrysotile asbestos.

7. A basic tenet of California law is that everyone is required to use ordinary care in their activities so as to regard the safety of others and prevent injury to others from their conduct or omissions. (Civ. Code, § 1714, subd. (a); Pedeferri v. Seidner Enterprises (2013) 216 Cal.App.4th 359, 365; Cabral v. Ralphs (2011) 51 Cal.4th 764; Merrill v. Navegar, Inc. (2002) 26 Cal.4th 465; Hilyar v. Union Ice Co. (1955) 45 Cal.2d 30, 36.)

8. At all times herein mentioned, defendants, their "alternate entities" and each of them, singularly and jointly, failed to use ordinary care to prevent harm to themselves or to others, negligently acted or failed to act, negligently did something that a reasonably careful person would not do in the same situation, negligently failed to do something that a reasonably careful person would do in the same situation, negligently and carelessly researched or failed to research, manufactured, fabricated, designed, modified, tested or failed to test, abated or failed to abate, warned or failed to warn of the health hazards, labeled or failed to label, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected or failed to inspect, serviced, installed, contracted for installation, repaired, marketed, warranted, rebranded, manufactured for others, packaged and advertised, removed, disturbed, failed to recall, and/or failed to retrofit, a certain substance, the generic name of which is asbestos and other products containing said substance, in that said substance proximately caused personal injuries to users, consumers, workers, bystanders, family members, and others, including the plaintiff herein (hereinafter collectively called "exposed persons"), while being used in a manner that was reasonably foreseeable, thereby rendering said substance unsafe and dangerous for use by "exposed persons."

9. Defendants, their "alternate entities," and each of them, had a duty to exercise due care in the pursuance of the activities mentioned above and defendants, and each of them, breached said duty of due care.

10.     Defendants, their "alternate entities" and each of them, knew, or should have known, and intended that the aforementioned asbestos and products containing asbestos would be transported by truck, rail, ship and other common carriers, that in the shipping process the products would break, crumble or be otherwise damaged; and/or that such products would be used for insulation, construction, drywalling, plastering, fireproofing, soundproofing, automotive, aircraft and/or other applications, including, but not limited to mixing, sawing, chipping, hammering, scraping, sanding, drilling, breaking, removal, "rip-out," clean up, and other manipulation, resulting in the indiscriminate or other release of airborne asbestos fibers, and that through such foreseeable use and/or handling "exposed persons," including plaintiff herein, would use or be in proximity to and exposed to said asbestos fibers, which contaminated the packaging, products, environment, and clothing of persons working in proximity to said products, directly or through reentrainment.

11.     Defendants, their "alternate entities" and each of them, knew, or should have known, and intended that the aforementioned asbestos and asbestos-containing products would be used, manipulated, or handled as specified in Exhibit A, which is attached hereto and incorporated by reference herein, resulting in the release of airborne asbestos fibers, and that through such foreseeable use and/or handling "exposed persons," including plaintiff herein, would be in proximity to and exposed to said asbestos fibers.

12.     Plaintiff VICTOR HALFON has used, handled or been otherwise exposed to asbestos and asbestos-containing products referred to herein in a manner that was reasonably foreseeable and from the intended use of the product.  Plaintiff's exposure to asbestos and asbestos-containing products occurred at various locations as set forth in Exhibit A, which is attached hereto and incorporated by reference herein.

13.     As a direct and proximate result of the conduct or omissions of the defendants, their "alternate entities," and each of them, as aforesaid, plaintiff's exposure to asbestos and asbestos-containing products caused severe and permanent injury, damage, loss, or harm to the plaintiff, including, but not limited to breathing difficulties, pleural disease, asbestosis, other lung

///

damage and/or cancer, the nature of which, along with the date of plaintiff's diagnosis, are set forth in Exhibit B, which is attached hereto and incorporated by reference herein.

14. Plaintiff is informed and believes, and thereon alleges, that progressive lung disease, cancer and other serious diseases and physical injury are caused by inhalation of asbestos fibers without contemporaneous perceptible trauma and that said disease results from exposure to asbestos and asbestos-containing products over a period of time.

15. Plaintiff VICTOR HALFON suffers from a condition related to exposure to asbestos and asbestos-containing products.

16. As a direct and proximate result of the aforesaid conduct of defendants, their "alternate entities," and each of them, plaintiff has suffered, and continues to suffer, permanent injuries and/or future increased risk of injuries to his person, body and health, including, but not limited to, pleural disease, asbestosis, other lung damage, and cancer, and the mental and emotional distress attendant thereto, from the effect of exposure to asbestos fibers, all to his general damage in a sum in excess of the jurisdictional limits of a limited civil case. This action is an Unlimited Civil Case as defined in Code of Civil Procedure § 88.

17. As a direct and proximate result of the aforesaid conduct of the defendants, their "alternate entities," and each of them, plaintiff has incurred, is presently incurring, and will incur in the future, liability for physicians, surgeons, nurses, hospital care, medicine, hospice care, X-rays, CT scans, PET scans, and other medical treatment, the true and exact amount thereof being unknown to plaintiff at this time, and plaintiff prays leave to amend this complaint accordingly when the true and exact cost thereof is ascertained.

18. As a further direct and proximate result of the said conduct of the defendants, their "alternate entities," and each of them, plaintiff has incurred, and will incur, loss of income, wages, profits and commissions, a diminishment of earning potential, and other pecuniary losses, the full nature and extent of which are not yet known to plaintiff; and leave is requested to amend this complaint to conform to proof at the time of trial.

19. The following defendants, their "alternate entities," and each of them, and their officers, directors and managing agents participated in, authorized, expressly and impliedly

ratified, and had full knowledge of, or should have known of, each of the acts set forth herein. The following defendants, their "alternate entities," and each of them, are liable for the fraudulent, oppressive, and malicious acts of their "alternate entities," and each of them, and each defendant's officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, the acts of each of their "alternate entities" as set forth herein. The herein-described conduct of said defendants listed in this paragraph below, their "alternate entities," and each of them, was and is willful, malicious, fraudulent, outrageous and in conscious disregard and indifference to the safety and health of "exposed persons." Plaintiff, for the sake of example and by way of punishing said defendants, seeks punitive damages according to proof against the following defendants only: HONEYWELL INTERNATIONAL INC. (FOR HONEYWELL CONTROLS) and J.T. THORPE & SON, INC.

WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities," and each of them, as hereinafter set forth.

SECOND CAUSE OF ACTION
(Products Liability)

AS AND FOR A SECOND, SEPARATE, FURTHER AND DISTINCT CAUSE OF ACTION FOR PRODUCTS LIABILITY, PLAINTIFF VICTOR HALFON COMPLAINS OF DEFENDANTS NAMED IN PARAGRAPH 3 HERE IN ABOVE, DOES 1-300, AND EACH OF THEM, PURSUANT TO BAJI 3.76, 3.77. 3.78, 9.00, 9.00.5, 9.00.7, AND CACI 431, 435, 1200, 1203, 1205, AND 1223, AND ALLEGES AS FOLLOWS:

20. Plaintiff incorporates herein by reference, as though fully set forth herein, the allegations and facts contained in all of the forgoing paragraphs.

21. Defendants, their "alternate entities," and each of them, defectively designed asbestos and asbestos-containing products and failed to adequately warn of potential safety hazards of asbestos and asbestos-containing products.

///

///

22.      Such asbestos and asbestos-containing products did not perform as safely as an ordinary consumer would expect when used or misused in an intended or reasonably foreseeable way.

23.      Such asbestos and asbestos-containing products when used or misused in an intended or reasonably foreseeable way had potential risks that were known or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community at the time of manufacture, distribution, or sale, and defendants failed to adequately warn of those potential risks.

24.      Defendants, their "alternate entities," and each of them, knew and intended that the above-referenced asbestos and asbestos-containing products would be used by the purchaser or user without inspection for defects therein or in any of their component parts and without knowledge of the hazards involved in such use.

25.      Said asbestos and asbestos-containing products were defective under California Consumer Safety Law and unsafe for their intended purpose in that the inhalation of asbestos fibers causes serious disease and/or death.  The defect existed in the said products at the time they left the possession of defendants, their "alternate entities," and each of them.  Said products did, in fact, cause personal injuries, including asbestosis, other lung damage, and cancer to "exposed persons," including plaintiff herein, while being used in a reasonably foreseeable manner, thereby rendering the same defective, unsafe and dangerous for use.  Moreover, said products failed to be designed, as required by California law, to account for foreseeable risks, even if they arise from the conduct of others.  Collins v. Navistar, Inc. (2013) 214 Cal.App.4th 1486, 1511.

26.      "Exposed persons" did not know of the substantial danger of using said products.  Said dangers were not readily recognizable by "exposed persons."  Said defendants, their "alternate entities," and each of them, further failed to adequately warn of the risks to which plaintiff and others similarly situated were exposed.

27.      In researching or failing to research, manufacturing, fabricating, designing, modifying, testing or failing to test, warning or failing to warn, labeling or failing to label,

assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing, marketing, warranting, rebranding, manufacturing for others, packaging and advertising, disturbing, removing, failing to recall, failing to retrofit asbestos and asbestos-containing products, defendants, their "alternate entities," and each of them, did so with reckless or conscious disregard for the safety of "exposed persons" who came in contact with said asbestos and asbestos-containing products, related to the intended use of said products by defendants, which intended use created hazardous circumstance and situation, in that said defendants, their "alternate entities," and each of them, had prior knowledge that there was a substantial risk of injury or death resulting from exposure to asbestos or asbestos-containing products, including, but not limited to, asbestosis, other lung disabilities and cancer. Said knowledge was obtained, in part, from scientific studies performed by, at the request of, or with the assistance of, said defendants, their "alternate entities," and each of them, and which knowledge was obtained by said defendants, their "alternate entities," and each of them on or before 1930, and thereafter.

28. On or before 1930, and thereafter, said defendants, their "alternate entities" and each of them, were aware that members of the general public and other "exposed persons," who would come in contact with their asbestos and asbestos-containing products, had no knowledge or information indicating that asbestos or asbestos-containing products could cause injury, and said defendants, their "alternate entities," and each of them, knew that members of the general public and other "exposed persons," who came in contact with asbestos and asbestos-containing products, would assume, and in fact did assume, that exposure to asbestos and asbestos-containing products was safe, when in fact said products and exposure thereto was extremely hazardous to health and human life.

29. With said knowledge, said defendants, their "alternate entities," and each of them, opted to research, manufacture, fabricate, design, modify, label, assemble, distribute, lease, buy, offer for sale, supply, sell, inspect, service, install, contract for installation, repair, market, warrant, rebrand, manufacture for others, package and advertise, remove, and disturb said asbestos and asbestos-containing products without attempting to protect "exposed persons" from,

or warn "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and asbestos-containing products. Rather than attempting to protect "exposed persons" from, or warn "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and asbestos-containing products, defendants, their "alternate entities," and each of them, intentionally failed to reveal their knowledge of said risk, and consciously and actively concealed and suppressed said knowledge from "exposed persons" and members of the general public, thus impliedly representing to "exposed persons" and members of the general public that asbestos and asbestos-containing products were safe for all reasonably foreseeable uses. Defendants, their "alternate entities," and each of them, engaged in this conduct and made these implied representations with the knowledge of the falsity of said implied representations.

30. The above-referenced conduct of said defendants, their "alternate entities," and each of them, was motivated by the financial interest of said defendants, their "alternate entities," and each of them, in the continuing, uninterrupted research, design, modification, manufacture, fabrication, labeling, assembly, distribution, lease, purchase, offer for sale, supply, sale, inspection, installation, contracting for installation, repair, marketing, warranting, rebranding, manufacturing for others, packaging and advertising, disturbing, removing of asbestos and asbestos-containing products. In pursuance of said financial motivation, said defendants, their "alternate entities," and each of them, consciously disregarded the safety of "exposed persons" and in fact were consciously willing and intended to permit asbestos and asbestos-containing products to cause injury to "exposed persons" and induced persons to work with and be exposed thereto, including plaintiff.

31. Plaintiff alleges that the aforementioned defendants, their "alternate entities," and each of them impliedly warranted their asbestos and asbestos-containing products, to be safe for their intended use but that their asbestos and asbestos-containing products, created an unreasonable risk of bodily harm to exposed persons.

32. Plaintiff further alleges his injuries are a result of cumulative exposure to asbestos and various asbestos-containing products manufactured, fabricated, inadequately researched, designed, modified, inadequately tested, labeled, assembled, distributed, leased, bought, offered

for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted, rebranded, manufactured for others, packaged and advertised by the aforementioned defendants, their "alternate entities," and each of them and that plaintiff cannot identify precisely which asbestos or asbestos-containing products caused the injuries complained of herein.

33. Plaintiff relied upon defendants', their "alternate entities'," and each of their representations, lack of warnings, and implied warranties of fitness of asbestos and their asbestos-containing products. As a direct, foreseeable and proximate result thereof, plaintiff has been injured permanently as alleged herein.

34. As a direct and proximate result of the actions and conduct outlined herein, plaintiff has suffered the injuries and damages previously alleged.

35. The following defendants, their "alternate entities," and each of them, and their officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, each of the acts set forth herein. The following defendants, their "alternate entities," and each of them, are liable for the fraudulent, oppressive, and malicious acts of their "alternate entities," and each of them, and each defendant's officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, the acts of each of their "alternate entities" as set forth herein. The herein-described conduct of said defendants listed in this paragraph below, their "alternate entities," and each of them, was and is willful, malicious, fraudulent, outrageous and in conscious disregard and indifference to the safety and health of "exposed persons." Plaintiff, for the sake of example and by way of punishing said defendants, seeks punitive damages according to proof against the following defendants only: HONEYWELL INTERNATIONAL INC. (FOR HONEYWELL CONTROLS) and J.T. THORPE & SON, INC.

WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities," and each of them, as hereinafter set forth.

///

THIRD CAUSE OF ACTION
(Negligence II)

AS AND FOR A FURTHER AND THIRD, SEPARATE AND DISTINCT CAUSE OF ACTION, PLAINTIFF VICTOR HALFON COMPLAINS OF DEFENDANTS HONEYWELL INTERNATIONAL INC. (FOR HONEYWELL CONTROLS); HOPEMAN BROTHERS, INC.; J.T. THORPE & SON, INC.; AND DOES 301 THROUGH 500, FOR NEGLIGENCE II, PURSUANT TO CIVIL CODE § 1714, BAJI 3.00, 3.10, 3.11, 3.12, 3.76, 3.77, 3.78, AND CACI 400, 401, 431, 435, AND ALLEGES AS FOLLOWS:

36. Plaintiff, by this reference, incorporates the allegations and facts contained in all of the forgoing paragraphs.

37. Plaintiff is informed and believes, and thereon alleges, that at all times mentioned herein, these Defendants and DOES 301 through 500, were individuals, or corporations, partnerships and/or unincorporated associations organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction, and that said defendants, and each of them, were and are authorized to do and are doing business in the State of California.

38. At all times herein mentioned, each of these Defendants was a successor, successor-in-business, assign, predecessor, predecessor-in-business, parent, subsidiary, wholly or partially owned by, or the whole or partial owner of an entity causing certain asbestos- and silica-containing insulation, other building materials, asbestos products and toxic substances to be constructed, installed, maintained, used, replaced and/or repaired on the respective premises owned, leased, maintained, managed and/or controlled by them. Said entities shall hereinafter collectively be called "alternate entities." Each of the herein-named defendants is liable for the tortuous conduct of each successor, successor-in-business, assign, predecessor-in-business, parent, subsidiary, whole or partial owner, or wholly or partially owned entity, that caused the presence as aforesaid of said asbestos- and silica-containing insulation, other asbestos products, and other toxic substances. Said defendants, and each of them, are liable for the acts of each and every "alternate entity," and each of them, in that there has been a virtual destruction of

plaintiff's remedy against each such alternate entity; defendants, and each of them, have acquired the assets, or a portion thereof, of each such alternate entity; defendants, and each of them, have caused the destruction of plaintiff's remedy against each such alternate entity; each such defendant has the ability to assume the risk-spreading role of each such alternate entity, and that each such defendant enjoys the goodwill originally attached to each such alternate entity.

39. At all times mentioned herein, these Defendants, and each of them, respectively, owned, leased, maintained, managed, and/or controlled the following premises where plaintiff VICTOR HALFON was present. The following information provided is preliminary, based on recall over events covering many years and further investigation and discovery may produce more reliable information:

| CONTRACTOR DEFENDANTS | LOCATION | TIME PERIOD |
|---|---|---|
| HONEYWELL INTERNATIONAL INC. (FOR HONEYWELL CONTROLS) | Hunters Point Naval Shipyard San Francisco, CA | 7/1/1966-8/31/1966; 7/13/1967-7/19/1967 |
| | Naval Air Station, Cecil Field Jacksonville/Yukon, FL | 10/5/1967-1/23/1969 |
| HOPEMAN BROTHERS, INC. | Various | Various |
| J.T. THORPE & SON, INC. | Various | Various |

Additionally, plaintiff VICTOR HALFON might have been present at these Defendants or other Defendants premises at other locations and on other occasions.

40. A basic tenet of California law is that everyone is required to use ordinary care to prevent injury to others from their conduct. (Civ. Code, § 1714, subd. (a); Pedeferri v. Seidner Enterprises (2013) 216 Cal.App.4th 359, 365.) This general rule requires a property owner, contractor, or other person to exercise ordinary care in the management of a premises in order to provide a safe work environment and to avoid exposing persons to an unreasonable risk of harm. (Rowland v. Christian (1968) 69 Cal.2d 108, 112-119; Sprecher v. Adamson Companies (1981) 30 Cal.3d 358, 371; Scott v. Chevron U.S.A. (1992) 5 Cal.App.4th 510, 515.; Torres v. Reardon (1992) 3 Cal.App.4th 831, 836-837; Pedeferri v. Seidner Enterprises, 216 Cal.App.4th 359.) Civil Code § 1714 does not limit responsibility for negligence to a certain class of defendants;

rather, it provides that "[e]very one is responsible for an injury occasioned to another by [one's] want of ordinary care or skill." (Safeco Ins. Co. v. Robert S. (2001) 26 Cal.4th 758, 764 (emphasis added).)

> Negligence may be active or passive in character. It may consist in heedlessly doing an improper thing or in heedlessly refraining from doing the proper thing. Whether the circumstances call for activity or passivity, one who does not do what he should is equally chargeable with negligence with him who does what he should not.

Basler v. Sacramento Gas & Electric Co. (1910) 158 Cal. 514, 518. Under general negligence principles, everyone is "obligated to exercise due care in his or her own actions so as not to create an unreasonable risk of injury to others, and this legal duty generally is owed to the class of persons who it is reasonably foreseeable may be injured as the result of the actor's conduct." Lugtu v. California Highway Patrol (2001) 26 Cal.4th 703, 716 (emphasis added); Cal. Civ. Code, § 1714; see generally Rest.2d Torts, § 281; Prosser & Keeton on Torts (5th ed. 1984) § 31, p. 169; 3 Harper, et al., The Law of Torts (2d ed. 1986) § 18.2, 654-655.

41. Prior to and at said times and places, said Defendants, and each of them, respectively, caused certain asbestos- and silica-containing insulation and other asbestos-products, other building materials, products and toxic substances to be constructed, installed, maintained, used, supplied, replaced, repaired, disturbed, swept, and/or vacuumed on each of the aforesaid respective premises, by their own workers and/or by various unqualified or unskilled contractors, and caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air and thereby created a hazardous and unsafe condition to plaintiff VICTOR HALFON and other persons exposed to said asbestos fibers and toxic substances while present at said premises.

42. At all times mentioned herein, said Defendants, and each of them, failed to use ordinary care to prevent harm to themselves or to others, negligently acted or failed to act, negligently did something that a reasonably careful person would not do in the same situation, negligently failed to do something that a reasonably careful person would do in the same situation.

///

43.     At all times mentioned herein, said Defendants, and each of them, knew or in the exercise of ordinary and reasonable care should have known, that the foregoing conditions and activities created a dangerous, hazardous, and unsafe condition and unreasonable risk of harm and personal injury to plaintiff and other workers or persons so exposed while present on each of the aforesaid respective premises.

44.     At all times relevant herein, plaintiff entered said premises and used or occupied each of said respective premises as intended and for each of the respective Defendants' benefit and advantage and at each of the respective Defendants' request and invitation.  In so doing, plaintiff was exposed to dangerous quantities of asbestos fibers and other toxic substances released into the ambient air by the aforesaid hazardous conditions and activities managed, maintained, initiated, and/or otherwise created, controlled, or caused by said Defendants, and each of them.

45.     At all times relevant herein, contractors received copies of the General Industry Safety Orders promulgated pursuant to California Labor Code § 6400 and the California Administrative Code under the Division of Industrial Safety, Department of Industrial Relations, including but not limited to Title VIII, Group 9 (Control of Hazardous Substances), Article 81, §§ 4150, 4106, 4107, and 4108, and Threshold Limit Values as documented for asbestos and other toxic substances under Appendix A, Table 1 of said Safety Orders; additionally, California Health and Safety Code § 40.200, *et seq.*, when provided materials for the State of California contractor license examination.

46.     Plaintiff at all times was unaware of the hazardous condition or the risk of personal injury created by the aforesaid presence and use of asbestos products and materials and other toxic substances on said premises.

47.     At all times mentioned herein, said Defendants, and each of them, remained in control of the premises where plaintiff was performing his work.

48.     At all times mentioned herein, said Defendants, and each of them retained control over safety and other related conditions and circumstances at plaintiff's job site(s) and

///

affirmatively contributed to and exercised, or failed to exercise, that control in a manner that caused plaintiff's injuries from asbestos-containing products and conduct.

49. At all times mentioned herein, the Defendants owed to plaintiff VICTOR HALFON and others similarly situated a duty to exercise ordinary care in the management of such premises in order to avoid exposing workers such as plaintiff to an unreasonable risk of harm and to avoid causing injury to said person, and said Defendants breached such duty.

50. At all times mentioned herein, said Defendants, and each of them, knew, or in the exercise of ordinary and reasonable care should have known, that the premises that were in their control would be used without knowledge of, or inspection for, defects or dangerous conditions and that the persons present and using said premises would not be aware of the aforesaid hazardous conditions to which they were exposed on the premises.

51. At all times mentioned herein, said Defendants, and each of them, negligently failed to maintain, manage, inspect, survey, or control said premises or to abate or correct, or to warn plaintiff of, the existence of the aforesaid dangerous conditions and hazards on said premises.

52. Prior to and at the times and places aforesaid, said Defendants, and each of them, respectively, caused certain asbestos- and silica-containing insulation and other asbestos-products, other building materials, products and toxic substances to be constructed, installed, maintained, used, replaced, disturbed, cleaned up, and/or repaired on each of their aforesaid respective premises, by their own workers and/or by employing various contractors, and caused the release of dangerous quantities of toxic asbestos fibers and other toxic substances into the ambient air and thereby injured plaintiff.

53. At all times mentioned herein, said Defendants, and each of them:

a. Should have recognized that the work of said contractors would create during the progress of the work, dangerous, hazardous, and unsafe conditions which could or would harm plaintiff VICTOR HALFON and others unless special precautions were taken;

///

///

b. Knew or had reason to know, that the contractors it had selected and hired to install, remove, abate or otherwise handle asbestos-containing materials were unfit, unskilled or otherwise unqualified to do so;

c. Failed to use reasonable care to discover whether the contractors it selected and hired to install, remove, abate or otherwise handle asbestos-containing materials were competent or qualified to do so.

54.   In part, plaintiff VICTOR HALFON was exposed to dangerous quantities of asbestos fibers and other toxic substances by reason of such contractors' failure to take the necessary precautions.

55.   The work of contractors on premises controlled by the Defendants created an unsafe premise and an unsafe work place by reason of the release of dangerous quantities of toxic substances including but not limited to asbestos.

56.   The unsafe premise or work place was created, in part, by the negligent conduct of the contractors employed by the Defendants.  Said negligent conduct includes but is not limited to:

a.   Failure to warn of asbestos and other toxic dusts;

b.   Failure to suppress the asbestos-containing or toxic dusts;

c.   Failure to remove the asbestos-containing and toxic dusts through use of ventilation or appropriate means;

d.   Failure to provide adequate breathing protection, i.e., approved respirators or masks;

e.   Failure to inspect and/or test the products and/or the air;

f.   Failure to provide medical monitoring;

g.   Failure to select and hire a careful and competent contractor or subcontractor;

h.   Failure to follow the applicable General Industry Safety Orders;

i.   Failure to keep abreast of the scientific and medical knowledge regarding potential hazards of asbestos and asbestos products available at the time.

j.     Failure to discharge their duty of ordinary care to avoid injury to others under the circumstances according to proof at trial.

57.    The Defendants' duty to maintain and provide safe premises, a safe place to work, and to warn of dangerous conditions are non-delegable; said duties arise out of common law, Civil Code § 1714, and Labor Code § 6400, *et seq*., or Health and Safety Code § 40.200, *et seq*., Cal-OSHA provisions, local air quality regulations, and regulations promulgated thereunder. Civil plaintiffs may use safety regulations non-retroactively to show a standard of care, even though the defendant is not their employer. Elsner v. Uveges (2004) 34 Cal.4th 915, 935-936; Millard v. Biosources, Inc. (2007) 156 Cal.App.4th 1338, 1348-1352; Tverberg v. Fillner Construction, Inc. (2011) 193 Cal.App.4th 1121, 1130. Therefore, the Defendants are responsible for any breach of said duties whether by themselves or others.

58.    Prior to and at said times and places, said Defendants were subject to certain ordinances, statutes, and other government regulations promulgated by the United States Government, the State of California, and others, including but not limited to the General Industry Safety Orders promulgated pursuant to California Labor Code § 6400 and the California Administrative Code under the Division of Industrial Safety, Department of Industrial Relations, including but not limited to Title VIII, Group 9 (Control of Hazardous Substances), Article 81, §§ 4150, 4106, 4107, and 4108, and Threshold Limit Values as documented for asbestos and other toxic substances under Appendix A, Table 1 of said Safety Orders; additionally, California Health and Safety Code § 40.200, *et seq*., which empowers for example the South Coast Area Air Quality Management District to promulgate regulations including but not limited to S.C.A.A.Q.M.D., Rule 1403; and empowers the Bay Area Air Quality Management District (B.A.A.Q.D.) to promulgate regulations including, but not limited to B.A.A.Q.D. Regulation 11, Rules 2 and 14, Title 40 Code of Federal Regulations, Chapter 1, Part 61, *et seq*. -- The National Emission Standards for Hazardous Air Pollutants, which required said Defendants to provide specific safeguards or precautions to prevent or reduce the inhalation of asbestos dust and other toxic fumes or substances; and said Defendants failed to provide the required safeguards and

///

precautions, or contractors employed by the Defendants failed to provide the required safeguards and precautions. Defendants' violations of said codes include but are not limited to:

(a) Failing to comply with statutes and allowing ambient levels of airborne asbestos fiber to exceed the permissible/allowable levels with regard to the aforementioned statutes;

(b) Failing to segregate work involving the release of asbestos or other toxic dusts;

(c) Failing to suppress dust using prescribed ventilation techniques;

(d) Failing to suppress dust using prescribed "wet down" techniques;

(e) Failing to warn or educate plaintiff or others regarding asbestos or other toxic substances on the premises;

(f) Failing to provide approved respiratory protection devices;

(g) Failing to ensure "approved" respiratory protection devices were used properly;

(h) Failing to provide for an on-going health screening program for those exposed to asbestos on the premises;

(i) Failing to provide adequate housekeeping and clean-up of the work place;

(j) Failing to properly warn of the hazards associated with asbestos as required by these statutes;

(k) Failing to properly report renovation and disturbance of asbestos-containing materials, including but not limited to the local air quality management district;

(l) Failing to have an asbestos removal supervisor as required by regulation;

(m) Failing to get approval for renovation as required by statutes;

(n) Failing to maintain records as required by statute;

(o) Failing to exercise ordinary care to avoid injury to others;

(p) Failing to test for asbestos content and/or release;

(q) Failing to retrofit; and

(r) Failing to recall.

59.    These Defendants, and each of them, were the "statutory employer" of plaintiff as defined by the California Labor Code and California case law.

60.    Plaintiff at all times was unaware of the hazardous condition or the risk of personal injury created by defendants' violation of said regulations, ordinances or statutes.

61.    At all times mentioned herein, plaintiff was a member of the class of persons whose safety was intended to be protected by the regulations, statutes or ordinances described in the foregoing paragraphs.

62.    At all times mentioned herein, said Defendants, and each of them, knew, or in the exercise of ordinary and reasonable care should have known, that the premises that were in their control would be used without knowledge of, or inspection for, defects or dangerous conditions, that the persons present and using said premises would not be aware of the aforesaid hazardous conditions to which they were exposed on the premises, and that such persons were unaware of the aforesaid violations of codes, regulations and statutes.

63.    As a legal consequence of the foregoing, plaintiff VICTOR HALFON developed an asbestos-related illness, which has caused great injury and disability as previously set forth, and plaintiff has suffered damages as herein alleged.

64.    The following defendants, their "alternate entities," and each of them, and their officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, each of the acts set forth herein. The following defendants, their "alternate entities," and each of them, are liable for the fraudulent, oppressive, and malicious acts of their "alternate entities," and each of them, and each defendant's officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, the acts of each of their "alternate entities" as set forth herein.  The herein-described conduct of said defendants listed in this paragraph below, their "alternate entities," and each of them, was and is willful, malicious, fraudulent, outrageous and in conscious disregard and indifference to the safety and health of "exposed persons."  Plaintiff, for the sake of example and by way of punishing said defendants,

///

seeks punitive damages according to proof against the following defendants HONEYWELL INTERNATIONAL INC. (FOR HONEYWELL CONTROLS) and J.T. THORPE & SON, INC.

WHEREFORE, plaintiff prays judgment against defendants, their "alternate entities," and each of them, as hereinafter set forth.

FOURTH CAUSE OF ACTION
Aiding and Abetting Battery
[Against Metropolitan Life Insurance Company and Does 750-790, Inclusive]

AS AND FOR A FURTHER, FOURTH, SEPARATE AND DISTINCT CAUSE OF ACTION FOR AIDING AND ABETTING BATTERY, PLAINTIFF COMPLAINS OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, DOES 750-790, THEIR ALTERNATE ENTITIES AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

65. Plaintiff incorporates herein by reference, as though fully set forth hereat, each and every allegation of the First and Second Causes of Action as though fully set forth herein.

66. This cause of action is for the aiding and abetting of battery by METROPOLITAN LIFE INSURANCE COMPANY ("MET LIFE"), primarily through its assistant medical director Anthony Lanza, M.D., of a breach of duty committed by Johns-Manville Corporation ("J-M").

67. Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned defendant MET LIFE was and is a corporation organized and existing under and by virtue of the laws of the State of New York or the laws of some other state or foreign jurisdiction, and that this defendant was and is authorized to do and/or was and is doing business in the State of California, and regularly conducted or conducts business in the County of San Francisco, State of California. At times relevant to this cause of action, MET LIFE was an insurer of J-M.

68. Plaintiff, was exposed to asbestos-containing dust created by the use of the asbestos products manufactured, distributed and/or supplied by J-M. This exposure to the asbestos or asbestos-related products supplied by J-M caused Plaintiff's asbestos-related disease and injuries.

69. Starting in 1928, MET LIFE sponsored studies of asbestos dust and asbestos-related disease in Canadian mines and mills, including those of J-M. Those studies revealed that

miners and mill workers were contracting asbestosis at relatively low levels of dust. McGill University, which conducted the studies, sought permission from MET LIFE to publish the results but they were never published. MET LIFE prepared its own report of these studies.

70. Between 1929 and 1931, MET LIFE studied dust levels and disease at five U.S. plants manufacturing asbestos-containing products, including a J-M plant. Those studies showed that workers in substantial numbers were contracting asbestosis, at levels less than what became the Threshold Limit Value ('TLV") of 5mppcf. The MET LIFE report was never published or disseminated except to plant owners, including J-M.

71. In 1932, MET LIFE studied dust levels and disease at the J-M plant at Manville, New Jersey. Results were consistent with those of the Canadian and previous U.S. plant studies. They were never published.

72. In 1934, J-M and others whose plants MET LIFE had studied agreed with MET LIFE that it should issue a report of its studies.

73. MET LIFE submitted a draft of its report to J-M. J-M requested, for legal and business reasons, that certain critical parts of the draft be changed. MET LIFE's official in charge was Lanza. MET LIFE through Lanza did make changes that J-M requested, including:

(a) Deletion of MET LIFE's conclusion that the permissible dust level for asbestos should be less than that for silica;

(b) Addition of the phrase that asbestosis clinically appeared to be milder than silicosis.

The report, thus altered, was published in 1935. It was misleading, and intentionally so, because it conveyed the incorrect propositions that asbestosis was a less serious disease process than silicosis and that higher levels of asbestos dust could be tolerated without contracting diseases than was the case for silica dust.

74. MET LIFE had a close relationship with J-M. It invested money in J-M. It provided group health and life insurance to J-M. MET LIFE IN 1934 agreed to supply industrial hygiene services to J-M, including dust counts, training employees to monitor dust levels,

///

examining employees, and recommending protective equipment.  MET LIFE and Lanza were viewed as experts on industrial dusts.

75.   In 1933, MET LIFE through Lanza issued the following advice to J-M:

(a)   Disagreeing with the recommendation of a J-M plant physician, MET LIFE advised against warning workers of the fact that asbestos dust is hazardous to their health, basing its advice in view of the extraordinary legal situation;

(b)   When the plant physician judged the best disposition of an employee with asbestosis was to remove him from the dust, MET LIFE advised instead that disposition should depend on his age, nature of work and other factors and to leave him alone if he is old and showing no disability, for, MET LIFE stated, economic and production factors must be balanced against medical factors.

76.   J-M followed the MET LIFE advices and did not warn its workers, including plaintiff, of the hazards of asbestos dust, and J-M also intentionally refrained from notifying workers of their disease.

77.   In 1936, MET LIFE, J-M and others founded the Air Hygiene Foundation ("AHF").  One of the AHF purposes was to develop standards for dust levels that would serve as a defense in lawsuits and workers' compensation claims.

78.   MET LIFE funded partially another study that tentatively recommended in 1938 a TLV for asbestos dust of 5mpccf, the same as for silica dust.  MET LIFE was aware of data from its own, unpublished reports that showed that level was too high for asbestos dust.  MET LIFE nonetheless promoted that TLV as proper.

79.   In June 1947, the Industrial Hygiene Foundation ("IHF") which succeeded to the AHF, issued a report of studies by Dr. Hemeon of U.S. asbestos plants, including a J-M plant. That report showed that workers exposed to less than the recommended maximum levels of dust were developing disease.  MET LIFE was a member of the IHF and Lanza was on its medical committee.  The Hemeon report, which was supplied to J-M and other owners, never was published.

///

80.    In 1936, J-M and other asbestos companies agreed with a leading medical research facility, Saranac Laboratories, that Saranac would research asbestos disease, but J-M and the others retained control over publication of the results. In 1943 Saranac's Dr. Leroy Gardner, in charge of the research, sent a draft to J-M that revealed that 81.8% of mice exposed to long fiber asbestos contracted cancer.

81.    Dr. Gardner died in 1946. J-M and other companies wanted parts of the Saranac results published and enlisted the assistance of MET LIFE's Lanza. J-M and other companies decided that Saranac's findings of cancer caused by asbestos in mice must be deleted, as well as Saranac's critique of existing dust standards. Lanza directed Saranac to delete the offending materials. Saranac did so, and the altered report was published in 1951 by Saranac's Dr. Vorwald, in the *AMA Archives of Industrial Hygiene*.

82.    Lanza left MET LIFE at the end of 1948, and took a position at New York University, funded by MET LIFE. He continued to misrepresent that asbestos does not cause cancer into the 1950s.

83.    The IHF (formerly AHF), of which MET LIFE was a member and MET LIFE official was on its medical committee, through Drs. Braun and Truan conducted a study of Canadian miners. The original report, in 1957, found an increased incidence of lung cancer in persons exposed to asbestos. The sponsors, including J-M, caused those findings to be stricken, and the report published in 1958 contained the false conclusion that asbestos exposure alone did not increase the risk of lung cancer.

84.    The false and misleading reports that a link between asbestos exposure and cancer was not proven influenced the TLV, for if a substance causes cancer the TLV must be very low or zero.

85.    J-M not later than 1933 was inflicting asbestos dust on its workers in its plants knowing that the dust was hazardous and was causing workers to contract disease that could and would disable and kill them. As MET LIFE advised, J-M did not warn its workers of the hazard. J-M committed battery on workers in its plants, including plaintiff, by that conduct.

///

86. MET LIFE knew that J-M's conduct constituted a breach of its duties to its workers. MET LIFE gave substantial assistance to J-M in committing batteries on its workers, including plaintiff, through MET LIFE's conduct described above, including by:

(a) Affirmatively urging J-M not to warn workers of the hazards of asbestos dust, in view of the extraordinary legal situation, such that J-M did not warn its workers, including plaintiff;

(b) Deleting the findings of its own draft report that the allowable limits for asbestos dust should be less than those for silica dust, and promoting a false and unsafe TLV which specified maximum levels of silica dust, and promoting a false and unsafe TLV which specified maximum levels of dust for workers, including plaintiff, which MET LIFE knew was wrong through its own studies;

(c) Advising J-M to keep certain workers continuing to work at dusty areas in the plant even after J-M was aware that their lungs showed asbestos-induced changes, lest other workers including plaintiff be alerted to the dangers of working in the dust.

WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE ENTITIES, and each of them, as hereinafter set forth.

FIFTH CAUSE OF ACTION
(Concert of Action)

AS AND FOR A FURTHER, SEPARATE AND DISTINCT CAUSE OF ACTION FOR CONCERT OF ACTION IN THE COMMISSION, ENCOURAGEMENT, AND ASSISTANCE OF BREACH OF DUTY TO WARN, PLAINTIFF COMPLAINS OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, PARKER-HANNIFIN CORPORATION, DOES 451-471, THEIR ALTERNATE ENTITIES, AND EACH OF THEM (hereinafter CONCERT OF ACTION DEFENDANTS), AND ALLEGES AS FOLLOWS:

87. Plaintiff incorporates herein by reference, as though fully set forth hereat each and every allegation of the First, Second and Fourth Causes of Action.

///

88.     The concerted action (hereinafter referred to as "concerted action" or "conspiracy") engaged in by the above-named CONCERT OF ACTION DEFENDANTS was facilitated through trade and other organizations including the Friction Materials Standards Institute (FMSI), which was a successor to similar trade organizations known as the Brake Lining Manufacturers' Association, and the Clutch Facing and Brake Lining Standards Institute. CONCERT OF ACTION DEFENDANTS were, during the times relevant to this cause of action, members of FMSI.

89.     The Friction Materials Standards Institute was originally incorporated under the name of Clutch Facing and Brake Lining Standards Institute in 1948 as a membership corporation. It included among its avowed purposes: the maintenance and raising of standards of all products manufactured by its members; the collection, assembly and dissemination to members of the friction materials industry scientific, engineering, technological and other relevant information pertaining to the industry; and to cooperate with governmental agencies for the general benefit of the public and the enhancement of the industry.

90.     Before 1971, CONCERT OF ACTION DEFENDANTS knew that exposure to asbestos dust created grave health risks for those exposed.  From 1971 forward, CONCERT OF ACTION DEFENDANTS received additional information distributed through the Friction Materials Standards Institute and through independent sources further confirming and elaborating the serious health risks associated with exposure to airborne asbestos dust.

91.     CONCERT OF ACTION DEFENDANTS knew that routine practices utilized in the handling and machining of their friction products during their installation and replacement created significant and dangerous quantities of airborne asbestos dust that would expose workers and bystanders to hazardous levels of asbestos.

92.     CONCERT OF ACTION DEFENDANTS knew that the magnitude of danger posed by asbestos was not widely known by their consumers.  CONCERT OF ACTION DEFENDANTS knew that exposure to asbestos dust among their consumers could be eliminated or greatly reduced by adopting different and discrete practices in the handling and machining of products and by instituting specific dust control procedures in their consumers' workplaces.

93.     Notwithstanding their knowledge of the dangers posed by exposure to asbestos, and notwithstanding their chartered ostensible purpose to cooperate with government agencies for the benefit of the public, CONCERT OF ACTION DEFENDANT members of the Friction Materials Standards Institute undertook concerted action to thwart, avoid, undermine, defeat, compromise, evade, and otherwise dilute regulations, standards, and procedures designed to reduce levels of exposure to asbestos dust and to raise awareness of the hazards of asbestos by consumers and friction materials workers.  Such activities include, but are not limited to the following:

(a)  CONCERT OF ACTION DEFENDANTS, at the urging and encouragement of the Friction Materials Standards Institute presented to the Illinois Pollution Control Board false and unsupportable opposition to a proposed prospective ban on the use of asbestos in friction materials.

(b)  CONCERT OF ACTION DEFENDANTS continuously undertook concerted action to thwart, avoid, undermine, defeat, compromise, evade, and otherwise dilute OSHA regulations, standards, and procedures aimed at reducing levels of ambient asbestos dust, requiring the use of safety equipment and procedures, and notification of potentially exposed persons of the dangers presented by asbestos dust.  CONCERT OF ACTION DEFENDANTS consistently misrepresented the state of science and knowledge to distort and confound public understanding and appreciation of the asbestos hazard, urging a higher level of airborne asbestos, less stringent requirements in the use of safety equipment and procedures, and a reduction in the scope and extent of any required notification regarding the hazards posed by asbestos.

(c)  CONCERT OF ACTION DEFENDANTS expressly undertook to adopt uniform interpretations of regulations among their membership, which interpretations consistently took the stance of performing at the lowest possible level which could be considered compliant.

94.     CONCERT OF ACTION DEFENDANT members of the Friction Materials Standards Institute, despite their avowed purpose to encourage and support research into

///

materials and manufacturing processes, expressly declined to pursue a proposed initiative to sponsor jointly funded research into feasible alternatives to asbestos in friction products.

95. Even though they knew of the substantial risks and dangers to those who would use or come into contact with their asbestos-containing products, defendants took concerted action by means of explicit and tacit agreements, to delay for a period of years providing notification and adequate warning of these risks and dangers, and to otherwise suppress information about said hazards or otherwise compromise and confound informed consumer appreciation of the asbestos hazards posed by their products.

96. Defendants knew that the users of their friction products would handle such products or their by-products in ways that enhanced the risks of dangerous asbestos exposure. Defendants failed to discharge their duty to provide timely and adequate notice of these hazards or of steps that could be taken to eliminate or ameliorate the risks and dangers. Each defendant, in failing to warn of these dangers, gave assistance and encouragement to every other member defendant to likewise fail to warn.

97. Defendants provided substantial assistance to one another in maintaining ignorance among consumers as to the full nature and extent of hazards posed by asbestos, and individually breached their duty to warn the consumers and users of their products.

98. In addition to the above named defendants in this cause of action, the term CONCERT OF ACTION DEFENDANTS as used herein includes but is not limited to: DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, Anthony Lanza, M.D., Arthur Vorwald, M.D., Leroy Gardner, M.D., Johns-Manville, Raybestos-Manhattan (now Raymark Industries, Inc. [Raymark]), Russell Manufacturing (whose liabilities have been assigned by H.K. Porter Company), Union Asbestos and Rubber Company, Thermoid Company (whose assets and liabilities have been purchased by H.K. Porter Company), Carey-Canada, Quebec Asbestos Corporation, Celotex Corporation, Industrial Hygiene Foundation, Mellon Institute, all members of the Asbestos Textile Institute [ATI], all members of the Friction Materials Standards Institute and its predecessors, and the other entities and individuals identified in this Cause of Action.

99.     Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, the CONCERT OF ACTION DEFENDANTS were and are corporations organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction, and that defendants were and are authorized to do and/or were and are doing business in the State of California, and that said defendants regularly conducted and/or conducts business in the County of San Francisco, State of California.

100.     Plaintiff was exposed to asbestos-containing dust created by the use of the asbestos products manufactured, distributed, and/or supplied by one or more of the CONCERT OF ACTION DEFENDANTS named herein.  The exposure to the asbestos or asbestos-related products supplied by the one or more of the CONCERT OF ACTION DEFENDANTS caused plaintiff's asbestos-related disease and injuries.

101.     The CONCERT OF ACTION DEFENDANTS, individually, and as agents of one another and as co-conspirators, agreed and conspired among themselves, with other asbestos manufacturers and distributors, and with certain individuals including, but not limited to Anthony Lanza, M.D. (Lanza) and defendant METROPOLITAN LIFE INSURANCE COMPANY (MET LIFE) to injure the plaintiff in the following fashion (the following is not an exclusive list of the wrongful acts of the conspirators, but a representative list):

(a)     Beginning in 1929, MET LIFE entered agreements with Johns-Manville and others to fund studies of the affects of asbestos exposure on Canadian asbestos miners. When the data from these studies proved that Canadian asbestos miners were developing asbestosis, MET LIFE, Johns-Manville, and others suppressed its publication; further, Anthony Lanza, M.D. (then a MET LIFE employee) actively misrepresented the results of the Canadian study for many years thereafter to meetings of health care professionals seeking information regarding asbestos exposure.

(b)     In approximately 1934, CONCERT OF ACTION DEFENDANTS Johns-Manville and MET LIFE, through their agents, Vandiver Brown and attorney J.C. Hobart, and conspirator Raybestos-Manhattan (Raybestos), through its agents, Sumner Simpson and J. Rohrbach, suggested to Dr. Lanza, Associate Director, MET LIFE (insurers of Johns-Manville

and Raybestos), that Dr. Lanza publish a study on asbestosis in which Lanza would affirmatively misrepresent material facts and conclusions about asbestos exposure; including but not limited to descriptions of the seriousness of the disease process of asbestosis. The misrepresentation was accomplished through intentional deletion of Dr. Lanza's initial description of asbestosis as "fatal" and through other selective editing that affirmatively misrepresented asbestosis as a disease process less serious than it was known to be by the CONCERT OF ACTION DEFENDANTS. As a result, Lanza's study was published in the medical literature containing said misleading statements in 1935. The CONCERT OF ACTION DEFENDANTS were motivated, in part, to effectuate this fraudulent misrepresentation and fraudulent nondisclosure by the desire to influence proposed legislation to regulate asbestos exposure, to provide a defense in lawsuits involving Johns-Manville, Raybestos, and MET LIFE, as insurer, and to promote the use of their asbestos products.

(c) The above-described conspiracy continued in 1936, when additional CONCERT OF ACTION DEFENDANTS American Brakeblok Corporation (defendant PNEUMO ABEX), defendant ASBESTOS MANUFACTURING COMPANY, defendant GATKE CORPORATION, Johns-Manville, Keasbey & Mattison Company (then an alter-ego to conspirator Turner & Newall, T&N), Raybestos-Manhattan (Raymark), Russell Manufacturing (whose liabilities have been assumed by H.K. Porter Company), Union Asbestos and Rubber Company and defendant USG, entered into an agreement with a leading medical research facility named Saranac Laboratories. (The following conspirators also joined the Friction Materials Standards Institute portion of the conspiracy alleged below: American Brake Block Corporation (now defendant Pneumo Abex), defendant Asbestos Manufacturing Company, defendant Gatke Corporation, Johns-Manville, Keasbey & Mattison Company (through Turner & Newall (T&N) alter-ego Atlas Asbestos), Raybestos-Manhattan and Russell Manufacturing (whose liabilities have been assumed by H.K. Porter Company).) Under the agreement, the CONCERT OF ACTION DEFENDANTS acquired the power to decide what information Saranac Laboratories could publish regarding asbestos disease and could also control in what form such publications were to occur. Their agreement provided these CONCERT OF ACTION DEFENDANTS the

power and ability affirmatively to misrepresent the results of the work at Saranac, and also gave these CONCERT OF ACTION DEFENDANTS power to suppress material facts included in any study. On numerous occasions thereafter, the CONCERT OF ACTION DEFENDANTS exercised their power to prevent Saranac scientists from disclosing material scientific data, resulting in numerous misstatements of fact regarding the health affects of asbestos exposure being made at scientific meetings.

(d) The conspiracy was furthered when on November 11, 1948, when representatives of the following CONCERT OF ACTION DEFENDANTS met at Johns-Manville headquarters: Johns-Manville, American Brakeblok Division of American Brake and Shoe Foundry (defendant Pneumo Abex), defendant Gatke Corporation, Garlock Sealing Technologies, LLC; Keasbey & Mattison Company (then an alter-ego to conspirator Turner & Newall (T&N)), Raybestos (now Raymark), Thermoid Company (whose assets and liabilities were later purchased by H.K. Porter Company), Union Asbestos and Rubber Company, defendant USG and MET LIFE. Defendant U.S. Gypsum did not send a company employee to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to take action on its behalf.

(e) At the November 11, 1948 meeting, these CONCERT OF ACTION DEFENDANTS, and their representatives, decided to exert their influence to materially alter and misrepresent material facts about the substance of research conducted by Dr. Leroy Gardner at the Saranac Laboratories beginning in 1936. Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects of asbestos on humans with a critical review of the then-existing standards for asbestos dust exposure.

(f) At this meeting, these CONCERT OF ACTION DEFENDANTS intentionally and affirmatively decided that Dr. Gardner's work should be edited to delete material facts about the cancer-causing propensity of asbestos, the health effects of asbestos on humans and the critique of the dust standards. The CONCERT OF ACTION DEFENDANTS then published these deceptive and fraudulent statements in the medical literature as edited by Dr. Arthur Vorwald, also of the Saranac Laboratories. These CONCERT OF ACTION

DEFENDANTS thereby fraudulently misrepresented the risks of asbestos exposure to the public, in general, and the class of persons exposed to asbestos, including the plaintiff.

(g) As a direct result of influence exerted by the CONCERT OF ACTION DEFENDANTS, Dr. Vorwald published Dr. Gardner's edited work in the Journal of Industrial Hygiene, AMA Archives of Industrial Hygiene and Occupational Health in 1951 in a form that stressed those portions of Dr. Gardner's work that the CONCERT OF ACTION DEFENDANTS wished stressed, but which omitted reference to human asbestosis and cancer, thereby fraudulently and affirmatively misrepresenting the extent of the risks. The CONCERT OF ACTION DEFENDANTS affirmatively and deliberately disseminated this deceptive and fraudulent Vorwald publication to university libraries, government officials, agencies, and others.

(h) Such actions constitute a material affirmative misrepresentation of the total context of material facts involved in Dr. Gardner's work and resulted in creating an appearance that inhalation of asbestos was less of health problem than Dr. Gardner's unedited work indicated.

(i) When Dr. Vorwald subsequently tried to publish more complete information regarding Dr. Gardner's animal studies, the CONCERT OF ACTION DEFENDANTS required his discharge from the Saranac Laboratories, denied him permission to publish or complete Gardner's work, and actively discouraged institutions of higher learning from hiring or retaining Dr. Vorwald in any capacity.

(j) The following CONCERT OF ACTION DEFENDANTS were members of the trade association known as Quebec Asbestos Mining Association (Q.A.M.A.): Johns-Manville Corporation, Carey-Canada, individually and as successor to Quebec Asbestos Corporation, the Celotex Corporation, successor to Quebec Asbestos Corporation, National Gypsum Company (now known as defendant Asbestos Claims Management Corporation), and Turner & Newall (T&N), individually and successor to defendant Bell Asbestos Mines Ltd. These conspirators, members of Q.A.M.A., participated in the above-described misrepresentation of the work of Dr. Leroy Gardner published by Dr. Arthur Vorwald in the AMA Archives of Industrial Health in 1951. Evidence of the Q.A.M.A.'s involvement in this misrepresentation

arises from co-conspirator Johns-Manville's membership of the Q.A.M.A., as well as correspondence from co-conspirators dated 1/29/47, 11/26/47, 3/6/48, 10/15/48, 3/8/49, and 9/6/50, all indicating close monitoring of the editing process of Q.A.M.A.'s representative, Ivan Sabourin, acting on behalf of all Q.A.M.A. members.

(k) As a furtherance of the conspiracy commenced in 1929, CONCERT OF ACTION DEFENDANTS who were members of the Q.A.M.A. as described above, began on or about 1950 to formulate a plan to influence public opinion about the relationship between asbestos and cancer by influencing the medical literature on this subject and then touting and disseminating this literature to the public and to organizations and legislative bodies responsible for regulatory control of asbestos with the specific intent of misrepresenting the existing scientific information and suppressing contrary scientific data in their possession and control.

(l) This plan of misrepresentation and influence over the medical literature began on or about 1950 when the aforementioned Q.A.M.A. members selected Saranac Laboratories to do an evaluation of whether cancer was related to asbestos. After a preliminary report authored by Dr. Arthur Vorwald in 1952 indicated that a cancer/asbestos relationship might exist in experimental animals, these Q.A.M.A. members refused to further fund the study, terminated the study, and prevented any public discussion of dissemination of the results.

(m) As a result of the termination of Q.A.M.A./Saranac study, the CONCERT OF ACTION DEFENDANTS fraudulently withheld information from the public and affirmatively misrepresented to the public and responsible legislative and regulatory bodies that asbestos did not cause cancer, including affirmative misrepresentations by CONCERT OF ACTION DEFENDANTS and CONCERT OF ACTION DEFENDANTS' agents K.W. Smith, M.D., Paul Cartier, M.D., A.J. Vorwald, M.D., Anthony Lanza, M.D., Vandiver Brown, and Ivan Sabourin, said misrepresentations being directed to inter alia, U.S. Government officials, Canadian government officials, U.S. National Cancer Institute, medical organizations, health professionals, and the general public, including plaintiff.

(n) Subsequently, the Q.A.M.A. CONCERT OF ACTION DEFENDANTS contracted with the Industrial Hygiene Foundation and Dr. Daniel Braun to further study the

relationship between asbestos exposure, asbestosis and lung cancer. In 1957, Drs. Braun and Truan (Braun and Truan) reported to the Q.A.M.A. that asbestosis did increase a worker's risk of incurring lung cancer.

(o) The Q.A.M.A. CONCERT OF ACTION DEFENDANTS as a furtherance of the conspiracy commenced in 1929, thereafter caused, in 1958, a publication of the work by Braun and Truan in which the findings regarding increased incidence of cancer in persons with asbestosis was edited out (stricken) by agents of the Q.A.M.A. The published version of Braun/Truan study contained a conclusion that asbestos exposure, alone, did not increase the incidence of lung cancer, a conclusion known by the conspirators to be false.

(p) By falsifying and causing publication of studies concluding that asbestos exposure did not cause lung cancer and simultaneously omitting documented findings that asbestosis did increase the risk of lung cancer, the CONCERT OF ACTION DEFENDANTS affirmatively misrepresented to the public and concealed from the public the extent of risks associated with inhalation of asbestos fibers.

(q) In furtherance of the ongoing 1929 conspiracy, in approximately 1958, these Q.A.M.A. CONCERT OF ACTION DEFENDANTS publicized the fraudulently edited works of Drs. Braun and Truan at a symposium in an effort to misrepresent fraudulently to the public and persons exposed to asbestos that the inhalation of asbestos dust would not cause cancer.

(r) The fraudulent misrepresentations beginning in 1929 as elaborated above and continuing with the publication of the 1958 Braun/Truan study influenced the standards set for asbestos exposure. The developers of such standards failed to lower the maximum exposure limits because a cancer risk, associated with asbestos inhalation, but had not been proven.

(s) In furtherance of the 1929 conspiracy, in 1967, Q.A.M.A. CONCERT OF ACTION DEFENDANTS decided, at their trade association meeting, that they would intentionally mislead consumers about the extent of risks involved in inhalation of asbestos products.

///

(t) In furtherance of the 1929 conspiracy, in 1952, a Symposium regarding the health effects of asbestos was held at the Saranac Laboratories. The following CONCERT OF ACTION DEFENDANTS were in attendance: MET LIFE, Lanza, Johns-Manville, Turner & Newall (T&N), Raybestos-Manhattan (now Raymark), and Q.A.M.A. members by way of their agents, Cartier, Sabourin and LaChance.

(u) At the 1952 Saranac meeting, the occurrence of lung cancer and asbestosis in product users was discussed and the carcinogenic properties of all fiber types of asbestos was also discussed. In an affirmative attempt to mislead the public about the extent of health risks associated with asbestos, and in an effort fraudulently to conceal those risks from the pubic, these CONCERT OF ACTION DEFENDANTS conspired to prevent publication of the record of this 1952 Saranac Symposium and it was not published. In addition, the CONCERT OF ACTION DEFENDANTS induced Dr. Vorwald not to announce the results of his and Dr. Gardner's animal studies showing excess cancers in animals which thereby fraudulently misrepresented existing secret data which could not be publicized owing to the secrecy provisions contained in the 1936 Saranac agreement heretofore described.

(v) The following CONCERT OF ACTION DEFENDANTS were members of the trade organization known as the Asbestos Textile Institute (ATI): Raybestos (now Raymark), Johns-Manville, H.K. Porter, Gatke Corporation; Garlock Sealing Technologies, LLC; Keasbey & Mattison, individually and through its alter-ego Turner & Newall (T&N) and National Gypsum (defendant Asbestos Claims Management Corporation), Uniroyal, Inc., individually and through its alter-egos, CDU Holding Company, Uniroyal Holding Company and Uniroyal Goodrich Tire Company.

(w) In furtherance of the forgoing conspiracy, in 1947, these CONCERT OF ACTION DEFENDANTS, members of the ATI, received a report from industrial hygienist W.C.L. Hemeon (Hemeon) regarding asbestos, which suggested re-evaluation of the then-existing maximum exposure limits for asbestos exposure. These CONCERT OF ACTION DEFENDANTS caused the Hemeon report not to be published and thereby fraudulently concealed material facts about asbestos exposure from the public and affirmatively

misrepresented to the public and class of persons exposed to asbestos that the then existing maximum exposure limit for asbestos was acceptable. Thereafter, these CONCERT OF ACTION DEFENDANTS withheld additional material information on the dust standards from The American Conference of Governmental Industrial Hygienists (ACGIH), thereby further influencing evaluations of their Threshold Limit Values for asbestos exposure.

(x) In furtherance of the forgoing conspiracy, in 1953, CONCERT OF ACTION DEFENDANT National Gypsum (Asbestos Claims Management Corporation), through its agents, in response to an inquiry from the Indiana Division of Industrial Hygiene regarding health hazards of asbestos spray products, refused to mail a proposed response to that division indicating that respirators should be worn by applicators of the products. National Gypsum's response distorted and fraudulently misrepresented the need for applicators of asbestos spray products to wear respirators and fraudulently concealed from such applicators the need for respirators and thereby misrepresented the risks associated with asbestos exposure.

(y) In furtherance of the forgoing conspiracy, in 1955, CONCERT OF ACTION DEFENDANT Johns-Manville, through its agent Dr. Kenneth Smith, caused to be published in the <u>AMA Archives of Industrial Health</u>, an article entitled "Pulmonary Disability in Asbestos Workers." This published study materially altered the results of an earlier study in 1949 concerning the same set of workers. This alteration of Dr. Smith's study constituted a fraudulent and material misrepresentation about the extent of the risk associated with asbestos inhalation.

(z) In furtherance of the forgoing conspiracy, in 1955, the National Cancer Institute held a meeting at which CONCERT OF ACTION DEFENDANT Johns-Manville, individually and as an agent for other co-conspirators and Dr. Vorwald, as agent of CONCERT OF ACTION DEFENDANTS, affirmatively misrepresented that there was no existing animal studies concerning the relationship between asbestos exposure and cancer, when, in fact, the CONCERT OF ACTION DEFENDANTS were in secret possession of several suppressed studies, which demonstrated that positive evidence did exist.

///

(aa) In furtherance of the forgoing conspiracy, in 1957, these CONCERT OF ACTION DEFENDANTS and members of the ATI, jointly rejected a proposed research study on cancer and asbestos and this resulted in fraudulently concealing from the public material facts regarding asbestos exposure, and also constituted an affirmative misrepresentation of the then-existing knowledge about asbestos exposure and lung cancer.

(bb) In furtherance of the forgoing conspiracy, in 1964, CONCERT OF ACTION DEFENDANTS who were members of the ATI met to formulate a plan for rebutting the association between lung cancer and asbestos exposure that had been recently published by Dr. Irving J. Selikoff of the Mount Sinai Research Center. Thereafter, these members of the ATI embarked upon a campaign to further misrepresent the association between asbestos exposure and lung cancer.

(cc) CONCERT OF ACTION DEFENDANT Mellon Institute and CONCERT OF ACTION DEFENDANT Industrial Hygiene Foundation (IHF) were institutes whose functions included involvement in research regarding the health effects of inhaling asbestos dust.

(dd) Beginning in the early 1940's, the IHF was involved in a study by Hemeon entitled Report of Preliminary Dust Investigation for Asbestos Textile Institute, June 1947. This study was done in connection with members of the Asbestos Textile Institute (ATI). This study found that workers exposed to less than the recommended maximum exposure level for asbestos were nonetheless developing disease. As a part of the conspiracy, the IHF never published this study.

(ee) Beginning in the mid 1950's, the IHF and the Mellon Institute were involved in the publication of works by Braun and Truan entitled An Epidemiological Study of Lung Cancer in Asbestos Miners. In its original, unedited form in September, 1957, this study had concluded that workers with asbestosis had an increased incidence of lung cancer and that the Canadian government had been under-reporting cases of asbestosis. The final, published version of this study in June 1958, deleted the conclusion that workers with asbestosis suffered an increased incidence of lung cancer and that the Canadian government had been under-reporting asbestosis cases. The IHF and the Mellon Institute conspired with the members of the

Quebec Asbestos Mining Association (Q.A.M.A.) and their legal counsel, Ivan Sabourin, and other CONCERT OF ACTION DEFENDANTS to delete the above-describe information regarding asbestos and cancer.

(ff) The above-described actions of the IHF and the Mellon Institute constituted intentional deception and fraud in actively misleading the public about the extent of the hazards connected with breathing asbestos dust.

(gg) The above-described conspiratorial and fraudulent actions of the IHF and the Mellon Institute substantially contributed to retarding the development of knowledge about the hazards of asbestos and thereby substantially contributed to injuries suffered by the plaintiff.

(hh) All CONCERT OF ACTION DEFENDANTS identified above, approved, ratified, and furthered the previous conspiratorial acts of CONCERT OF ACTION DEFENDANTS Johns-Manville, Raybestos (now Raymark), Lanza, and MET LIFE, and all the alleged co-conspirators during the date and circumstances set forth above, acted as agents, and co-conspirators for the other CONCERT OF ACTION DEFENDANTS.

(ii) As evidence of Raymark's fraud, concealment, suppression, and conspiratorial misconduct and of the referenced CONCERT OF ACTION DEFENDANTS, and each of them, as herein set forth, Raymark's President and/or other senior executives corresponded with other senior executives of Raymark's co-conspirators, which series of correspondence and related documents and papers are commonly referenced as "The Sumner Simpson Papers."

(jj) Further as evidence of the fraud, concealment, suppression, and conspiratorial misconduct of the members of the Asbestos Textile Institute as herein set forth, the ATI and the Industrial Hygiene Foundation kept minutes of their regular meetings, discussions, resolutions, and related actions, recorded in "The ATI Minutes."

(kk) MET LIFE was an active participant in the foregoing conspiracy and benefitted thereby. MET LIFE benefitted from its involvement, because of the following non-exclusive list:

(1)    by providing workers' compensation insurance to the CONCERT OF ACTION DEFENDANTS;

(2)    by providing life insurance for employees of the CONCERT OF ACTION DEFENDANTS;

(3)    by providing health insurance or health care for the employees of the CONCERT OF ACTION DEFENDANTS;

(4)    by providing health information and resources;

(5)    by purchasing substantial stock in asbestos-related companies, including stock of CONCERT OF ACTION DEFENDANTS; and

(6)    by developing information by which asbestos-related claims for compensation could be defeated.

102.    The foregoing conspiracy was furthered through the formation of the Friction Materials Standards Institute [FMSI] and its predecessors, the Brake Lining Manufacturers' Association, and the Clutch Facing and Brake Lining Standards Institute.  The members thereof joined with, ratified, and furthered the conspiratorial actions of the above-identified conspirators.

(1)    The Friction Materials Standards Institute, and its predecessors, the Brake Lining Manufacturers' Association, the Clutch Facing & Brake Linings Standards Institute, were formed to be the ears and mouthpiece of the friction materials industry.  The initial members of the Friction Materials Standards Institute between 1950 and 1953 included CONCERT OF ACTION DEFENDANTS Asbestos Manufacturing Company, T&N, PLC. (through its alter-ego Atlas Asbestos Company), Brassbestos Brake Lining Company, Fibre & Metal Products Company, Gatke Corporation, Maremont (through its predecessor-in-interest Grizzly Manufacturing), H. Krasne Manufacturing Company, Lasco Brake Products, HONEYWELL, INC. (successor-in-interest to ALLIEDSIGNAL INC. -- then known as Bendix Aviation Corporation), L. J. Miley Company, Raymark (then known as Raybestos-Manhattan), Riteset Manufacturing Company, Rossendale-Ruboil Company, Russell Manufacturing Company, Scandura (then known as Scandinavian Belting Company), Southern Friction Materials Company, U.S. Spring & Bumper Company, Pneumo Abex (Through its Predecessor-in-interest,

S.K. Wellman Company) and Lear-Siegler, Inc. (now Lear-Siegler Diversified Holdings Corp.) And Bridgestone/Firestone, Inc. (through their predecessor-in-interest World Bestos Corporation). By 1973, the following joined the Friction Materials Standards Institute: CONCERT OF ACTION DEFENDANTS Auto Friction Corporation, Auto Specialties Manufacturing Company, Chrysler Corporation, Emsco Asbestos Company, Forcee Manufacturing Corporation, General Motors Corporation, H.K. Porter Company (through its Thermoid division), Johns-Manville Corporation, Lear-Siegler, Inc. (now Lear-Siegler Diversified Holdings Corp.) (Through its Predecessor-in-interest Royal Industries), Molded Industrial Friction Corporation, Morton-Thiokol (Through its Predecessor-in-interest Thiokol Chemical Corporation), National Transport Supply Inc., Parker-Hannifin Corporation (through its predecessor-in-interest Pick Manufacturing Company), Pneumo Abex's American Brakeblok division, Silver Line Products Inc., Standco Inc., Universal Friction Materials Company, and Wheeling Brake Block Manufacturing Company. On information and belief, plaintiff alleges that the following manufacturers and/or distributors of asbestos-containing automotive friction products joined with, ratified, and furthered the conspiratorial actions of the above-identified conspirators, including the conspirators who were members of the FMSI and its predecessors: CONCERT OF ACTION DEFENDANTS, The Budd Company, Dana Corporation, Ford Motor Company, General Motors Corporation, Lear-Siegler, Inc. (now Lear-Siegler Diversified Holdings Corp.), Morton-Thiokol (now Morton International, Inc. ), Standard Motor Products, Inc. (EIS Brand Brakes); and Borg-Warner.

(2) Even though they disseminated materials and information to the contrary, The Friction Materials Standards Institute conspirators knew, and suppressed, that:

(i) OSHA regulations, even if enforced and complied with, would not prevent asbestos disease in workers exposed to their products;

(ii) chrysotile asbestos caused mesothelioma and other incurable disease;

///

///

(iii) brake workers suffered "considerable exposures" to respirable asbestos fibers during the intended use, installation, and expected replacement of friction materials;

(iv) there was no "safe" level of occupational exposure to respirable asbestos; and

(v) there was a substantial risk and danger suffered by bystanders and family members of brake mechanics, because of the release of respirable asbestos in the use of friction materials, as herein described.

(3) Even though they knew of the substantial risks and dangers to those who would use or come into contact with their asbestos-containing products, CONCERT OF ACTION DEFENDANTS took concerted action by means of explicit and tacit agreements, to delay for a period of years providing notification and adequate warning of the risks and dangers. CONCERT OF ACTION DEFENDANTS knew that the users of their products would handle such products or their by-products in ways that enhanced the risks of dangerous asbestos exposure, but they conspired to give each other assistance and encouragement in failing to provide timely and adequate notices of the hazards or of steps that would be taken to eliminate or ameliorate the risks and dangers.

103. The acts and omissions of the CONCERT OF ACTION DEFENDANTS, as described above, and each of them, constitute fraudulent concealment and/or fraudulent misrepresentation, which caused injury to the plaintiff, including, but not limited to, the following manner:

(a) The material published or caused to be published by the CONCERT OF ACTION DEFENDANTS was false and incomplete in that the CONCERT OF ACTION DEFENDANTS, knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-related products.

(b) The CONCERT OF ACTION DEFENDANTS, with intent to defraud, individually, as members of a conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS, intended that the publication of false and misleading reports to the general

public and individuals therein, and/or the intentional suppression and nondisclosure of documented reports of health hazards of asbestos:

(1) maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

(2) assist in the continued pecuniary gain of CONCERT OF ACTION DEFENDANTS, through the sale of their products;

(3) influence in the CONCERT OF ACTION DEFENDANTS' favor proposed legislation to regulate asbestos exposure and;

(4) provide a defense in law suits brought for injury resulting from asbestos disease.

(c) The CONCERT OF ACTION DEFENDANTS, individually, as members of a conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS, had a duty to disclose information regarding the health hazards of asbestos within their knowledge and/or control. The CONCERT OF ACTION DEFENDANTS, knowingly, and intentionally breached this duty through their fraudulent concealment as described herein.

(d) Plaintiff and others reasonably relied, both directly and indirectly, upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and in the absence of published medical and scientific reports of the hazards of asbestos continued exposure to asbestos. Plaintiff believed asbestos to be safe and was unaware of the hazards due to conspiratorial and fraudulent conduct. Plaintiff was not warned of the hazards of asbestos dust as a direct result of the above-described conspiracy and fraudulent concealment. If plaintiff had known of the health hazards of asbestos, of which plaintiff was unaware as a direct result of the conspirator's fraudulent concealment, plaintiff would have acted differently regarding plaintiff's exposure to asbestos and asbestos-related products.

(e) CONCERT OF ACTION DEFENDANTS, individually, as members of a conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS, intended that plaintiff rely on the deceptive and fraudulent reports that the conspiracy caused to be published throughout the United States regarding the safety of asbestos and asbestos-related products and to

rely on the absence of published medical and scientific data (because of the CONCERT OF ACTION DEFENDANTS's suppression) regarding the hazards of asbestos and asbestos-related products and thereby caused plaintiff and others to continue their exposure to asbestos products.

(f) CONCERT OF ACTION DEFENDANTS, individually, as members of a conspiracy, and as agents of other CONCERT OF ACTION DEFENDANTS were and are in a position of superior knowledge regarding the health hazards of asbestos and therefore the plaintiff reasonably relied, both directly and indirectly, on the published reports commissioned by the CONCERT OF ACTION DEFENDANTS, regarding the health hazards of asbestos and the absence of published information (because of the suppression by the CONCERT OF ACTION DEFENDANTS) regarding the hazards of asbestos and asbestos-related products.

(g) As a direct result of the continuing and on-going conduct of the CONCERT OF ACTION DEFENDANTS, as alleged herein, the plaintiff contracted asbestos-related disease and suffered injuries and incurred damages, which are described in greater detail in the forgoing Paragraphs.

104. MET LIFE acted in concert with the foregoing described parties (the CONCERT OF ACTION DEFENDANTS) and pursuant to a common design, as previously described, to cause injury to plaintiff.

105. MET LIFE knew that the conduct of Johns-Manville, Raybestos (now Raymark), defendant USG, American Brakeblok Corporation (now defendant PNEUMO ABEX), Keasbey-Mattison Company (now T&N), and the other CONCERT OF ACTION DEFENDANTS was coercive, fraudulent, and deceitful towards others (including plaintiff) and that CONCERT OF ACTION DEFENDANTS' conduct was a breach of duties owed to plaintiff; and MET LIFE gave substantial assistance and encouragement to Johns-Manville and the other CONCERT OF ACTION DEFENDANTS in breaching their duties to plaintiff and others.

106. MET LIFE provided substantial assistance to the foregoing CONCERT OF ACTION DEFENDANTS in accomplishing their tortious result and their breach of duties to plaintiff.

///

107.    Plaintiff was insured, directly or indirectly, by MET LIFE and as such was owed a fiduciary duty by MET LIFE which duty was breached by its foregoing conduct and conspiracy which thereby caused plaintiff's asbestos-related injuries.

108.    The CONCERT OF ACTION DEFENDANTS made representations to plaintiff and others concerning asbestos-containing products including but not limited to:

        (a)    the statements set forth and summarized in the foregoing paragraphs

        (b)    that asbestos in commercially used insulation products was not hazardous (this statement was known to be false by the CONCERT OF ACTION DEFENDANTS)

        (c)    the amount of asbestos in the air necessary to cause disease was five million particles per cubic foot (this statement was known to be false by the CONCERT OF ACTION DEFENDANTS)

        (d)    that asbestos does not cause cancer (this statement was known to be false by the CONCERT OF ACTION DEFENDANTS);

        (e)    in addition, the CONCERT OF ACTION DEFENDANTS actively and fraudulently concealed facts from the plaintiff and others including, but not limited to:

                (1)    that asbestos-related disease can be a fatal disease,

                (2)    that asbestos causes various forms of lung cancer,

                (3)    that individuals should protect themselves from breathing asbestos dust,

                (4)    the extent of asbestos disease in exposed populations,

                (5)    information regarding the levels of airborne asbestos that can cause disease,

                (6)    their experience with workers' compensation claims related to asbestos exposure,

                (7)    the statements set forth in foregoing paragraphs.

109.    Further, the CONCERT OF ACTION DEFENDANTS knew that their foregoing statements were false and that, by their acts, they were actively and fraudulently concealing adverse information regarding the health affects of asbestos including the facts set forth above;

the CONCERT OF ACTION DEFENDANTS made the false statements and concealed the information with the intent to deceive; plaintiff and others relied both directly and indirectly on the foregoing false statements and their lack of knowledge resulting from their fraudulent concealment, resulting in and causing asbestos-related injuries and damages as more fully set forth herein.

110. The asbestos-containing products that CONCERT OF ACTION DEFENDANTS manufactured, marketed, distributed, sold, and otherwise supplied were defective; plaintiff was exposed to asbestos from the CONCERT OF ACTION DEFENDANTS' products, which caused his asbestos-related injuries as more fully set forth in the foregoing paragraphs.

111. Additionally and alternatively, as a direct result of MET LIFE's actions and omissions, plaintiff was caused to remain ignorant of all the dangers of asbestos resulting in plaintiff, his agents, employers, and the general public to be aware of the true and full dangers of asbestos, deprive plaintiff of the opportunity to decide for himself whether he wanted to take the risk of being exposed to asbestos, denied plaintiff the opportunity to take precautions against the dangers of asbestos and caused plaintiff's damages herein.

WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE ENTITIES, and each of them, as hereinafter set forth.

## SIXTH CAUSE OF ACTION
(Fraud and Deceit/Concealment)

AS AND FOR A FURTHER, SEPARATE AND DISTINCT CAUSE OF ACTION FOR FRAUD AND DECEIT/CONCEALMENT, PLAINTIFF COMPLAINS OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY, DOES 472-480, THEIR ALTERNATE ENTITIES, AND EACH OF THEM (hereinafter FRAUD DEFENDANTS), AND ALLEGES AS FOLLOWS:

112. Plaintiff incorporates herein by reference, as though fully set forth hereat, each and every allegation of the First, Second, Fourth and Fifth Causes of Action as though fully set forth herein.

///

113.    The term FRAUD DEFENDANTS as used herein includes but is not limited to: METROPOLITAN LIFE INSURANCE COMPANY, Anthony Lanza, M.D., Johns-Manville, Raybestos-Manhattan (now Raymark Industries, Inc. [Raymark]), United States Gypsum Company [USG]), American Brakeblok Corporation (now Pneumo Abex Corporation [Pneumo Abex]), Keasbey-Mattison Company (now T&N, Ltd. [T&N]), all members of the Asbestos Textile Institute [ATI], American Conference of Industrial Hygienists, Inc., and the other entities and individuals identified in this Cause of Action.

114.    Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, the FRAUD DEFENDANTS were and are corporations organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction, and that defendants were and are authorized to do and/or were and are doing business in the State of California, and that said defendants regularly conducted and/or conducts business in the County of San Francisco, State of California.

115.    FRAUD DEFENDANT American Conference of Governmental Industrial Hygienists, Inc. (ACGIH) sets guidelines for occupational health called Threshold Limit Values (TLVs).  These guidelines are relied on by OSHA (the Occupational Safety and Health Administration) in the United States and similar agencies around the world.  Criticisms of the guide-line setting process have pointed to problems with data collection, inadequate research, overwhelming dependence on data supplied by financially interested corporations, and slow response to advances in medical information.  In carrying out the aforesaid acts, the ACGIH was negligent in their failure to analyze or critically evaluate previously published literature, or review and incorporate current literature, failure to adequately assess the financially motivated scientific data provided by asbestos corporations, their insurers, and medical consultants, and their limited review process, including but not limited to the following representative list:

(a) The NATIONAL CONFERENCE OF GOVERNMENT INDUSTRIAL HYGIENISTS (NCGIH) was formed in 1938.  In 1942, the NCGIH began to develop a list of proposed Maximum Permissible Concentrations (MPC) or Maximum Allowable Atmospheric Concentrations, for various hazardous atmospheric substances, including asbestos.  In the

minutes of the Fifth Annual Meeting in 1942, the MPC Subcommittee internally noted that the MPC's were "not to be construed as recommended safe concentrations." In 1946, the NCGIH was renamed the American Conference of Governmental Industrial Hygienists, Inc. (ACGIH), and despite the internally acknowledged inadequacy of the asbestos MPC or the lack of any research by the ACGIH, they adopted, circulated, represented, and otherwise promulgated a 5 million particles per cubic foot (mppcf) asbestos guideline based on a faulty study performed by Dr. W.C. Dreessen in 1938 at a textile plant in North Carolina.

(b) In 1947, the ACGIH vaguely defined the MPC as "that amount of gas, vapor, fume, or dust which can be tolerated by man with no bodily discomfort nor impairment of bodily function, either immediate or after years of exposure." In 1948, they changed the name of the guideline from MPC to Threshold Limit Values (TLV), but still failed to adequately define the guideline or verify its propriety or scientific justification. In 1953, they issued a new conflicted definition, describing the guideline as both an "average" and a "maximum." Despite their failure to conduct any new evaluations or research, in 1961, the ACGIH propounded a new definition of the TLV as a "time-weighted average concentration." While arbitrarily adopting and changing the definition of the TLV, the ACGIH never performed any studies to test the scientific validity of the 5 mppcf TLV guideline.

(c) In 1968, the ACGIH reviewed the 5 mppcf guideline, and replaced it with a 2 mppcf guideline. However, the ACGIH negligently published the new guideline as 12 mppcf, never intending said numeric figure to be the actual recommended guideline. Despite internally acknowledging the error in their annual meetings, the ACGIH did not correct it until 1971.

(d) Despite decades of scientific studies linking asbestos to cancer, the ACGIH ignored the carcinogenic dangers of asbestos until 1974.

116. Plaintiff was exposed to asbestos-containing dust created by the use of the asbestos products manufactured, distributed and/or supplied by one or more of the FRAUD DEFENDANTS. The exposure to the asbestos or asbestos-related products supplied by the FRAUD DEFENDANTS caused plaintiff's asbestos-related disease and injuries.

///

117. Plaintiff incorporates herein by reference, as though fully set forth hereat at, each and every paragraph of the Fifth Cause of Action, which describes the allegations against, and actions of the CONSPIRACY DEFENDANTS.

118. Further, the FRAUD DEFENDANTS knew that their foregoing statements were false and that by their acts they were actively and fraudulently concealing adverse information regarding the health affects of asbestos including the facts set forth above; the FRAUD DEFENDANTS made the false statements and concealed the information with the intent to deceive; plaintiff and others relied both directly and indirectly on the foregoing false statements and their lack of knowledge resulting from their fraudulent concealment, resulting in and causing asbestos-related injuries and damages as more fully set forth herein.

119. The asbestos-containing products that FRAUD DEFENDANTS manufactured, marketed, distributed, sold, and otherwise supplied were defective; plaintiff was exposed to asbestos from the FRAUD DEFENDANTS' products which caused his asbestos-related injuries as more fully set forth in the foregoing paragraphs.

120. Additionally and alternatively, as a direct result of FRAUD DEFENDANT MET LIFE's actions and omissions, plaintiff was caused to remain ignorant of all the dangers of asbestos resulting in plaintiff, his agents, employers, and the general public to be aware of the true and full dangers of asbestos, deprive plaintiff of the opportunity to decide for himself whether he wanted to take the risk of being exposed to asbestos, denied plaintiff the opportunity to take precautions against the dangers of asbestos and caused plaintiff's damages herein.

WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE ENTITIES, and each of them, as hereinafter set forth.

## SEVENTH CAUSE OF ACTION
(Fraud and Deceit/Intentional Misrepresentation)

AS AND FOR A FURTHER, SEVENTH, SEPARATE AND DISTINCT CAUSE OF ACTION FOR FRAUD AND DECEIT/INTENTIONAL MISREPRESENTATION, PLAINTIFF COMPLAINS OF DEFENDANTS METROPOLITAN LIFE INSURANCE COMPANY,

///

DOES 740-750, THEIR ALTERNATE ENTITIES AND EACH OF THEM (hereinafter INTENTIONAL MISREPRESENTATION DEFENDANTS), AND ALLEGES AS FOLLOWS:

121. Plaintiff incorporates herein by reference, as though fully set forth hereat, each and every allegation of the First and Second Causes of Action, and each and every paragraph of the Fourth, Fifth and Sixth Causes of Action that describes the allegations against, and actions of the CONSPIRACY DEFENDANT MET LIFE as though fully set forth herein.

122. Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, the INTENTIONAL MISREPRESENTATION DEFENDANTS were and are corporations organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction, and that defendants were and are authorized to do and/or were and are doing business in the State of California, and that said defendants regularly conducted and/or conducts business in the County of San Francisco, State of California.

123. Plaintiff incorporates herein by reference, as though fully set forth hereat, each and every paragraph of the Fifth Cause of Action that describes the allegations against, and actions of the CONSPIRACY DEFENDANT MET LIFE.

124. Further, the INTENTIONAL MISREPRESENTATION DEFENDANTS knew that their foregoing statements were false and that by their acts they were actively and fraudulently concealing adverse information regarding the health affects of asbestos including the facts set forth above; the INTENTIONAL MISREPRESENTATION DEFENDANTS made the false statements and misrepresented the information with the intent to deceive; plaintiff and others relied both directly and indirectly on the foregoing false statements and their lack of knowledge resulting from their intentional misrepresentation, resulting in and causing asbestos-related injuries and damages as more fully set forth herein.

125. The asbestos-containing products that INTENTIONAL MISREPRESENTATION DEFENDANTS manufactured, marketed, distributed, sold, and otherwise supplied were defective; plaintiff was exposed to asbestos from the INTENTIONAL MISREPRESENTATION DEFENDANTS' products, which caused his asbestos-related injuries as more fully set forth in the foregoing paragraphs.

126. Additionally and alternatively, as a direct result of INTENTIONAL MISREPRESENTATION DEFENDANTS MET LIFE's actions and omissions, plaintiff was caused to remain ignorant of all the dangers of asbestos resulting in plaintiff, his agents, employers and the general public to be aware of the true and full dangers of asbestos, deprive plaintiff of the opportunity to decide for himself whether he wanted to take the risk of being exposed to asbestos, denied plaintiff the opportunity to take precautions against the dangers of asbestos and caused plaintiff's damages herein.

WHEREFORE, plaintiff prays judgment against defendants, their ALTERNATE ENTITIES, and each of them, as hereinafter set forth.

EIGHTH CAUSE OF ACTION
(Loss of Consortium)

AS AND FOR A FURTHER, SEPARATE, AND DISTINCT CAUSE OF ACTION FOR LOSS OF CONSORTIUM, PLAINTIFF KAREN HALFON COMPLAINS OF DEFENDANTS, DOES 1-500, THEIR "ALTERNATE ENTITIES," AND EACH OF THEM, AND ALLEGES AS FOLLOWS:

127. Plaintiff incorporates by reference here, each and every forgoing paragraph.

128. Plaintiffs VICTOR HALFON and KAREN HALFON were married on July 7, 1968, and at all times relevant to this action were, and are now, husband and wife.

129. Prior to plaintiff VICTOR HALFON's injuries as alleged, he was able and did perform duties as a spouse. Subsequent to the injuries and as a proximate result thereof, VICTOR HALFON has been unable to perform the necessary duties as a spouse and the work and service usually performed in the care, maintenance and management of the family home, and he will be unable to perform such work, service and duties in the future. As a proximate result thereof, plaintiff KAREN HALFON has been permanently deprived and will be deprived of the consortium of her spouse, including the performance of duties, all to her damages, in an amount presently unknown but which will be proved at the time of trial.

130. Plaintiff's discovery of the cause of her loss of consortium, as herein alleged, first occurred within two years of the date this complaint was filed.



131. As a direct and proximate result of the acts of defendants, their "alternate entities," and each of them, and the severe injuries caused thereby to plaintiff VICTOR HALFON as set forth in this complaint, plaintiff KAREN HALFON has suffered, and for a long period of time will continue to suffer loss of consortium, including but not by way of limitation, loss of services, marital relations, society, comfort, companionship, love and affection of said spouse, and has suffered severe mental and emotional distress and general nervousness as a result thereof.

WHEREFORE, plaintiffs pray judgment against defendants, their "alternate entities," and each of them, as follows:

Plaintiff VICTOR HALFON:

1. For plaintiff's general damages according to proof;

2. For plaintiff's loss of income, wages, earning potential, and household services according to proof;

3. For plaintiff's medical and related expenses according to proof;

Plaintiff KAREN HALFON:

4. For plaintiff's damages for loss of consortium according to proof;

Plaintiffs VICTOR HALFON and KAREN HALFON:

5. For plaintiffs' cost of suit herein;

6. For exemplary or punitive damages according to proof against defendants HONEYWELL INTERNATIONAL INC. (FOR HONEYWELL CONTROLS) and J.T. THORPE & SON, INC., only;

7. For damages for fraud according to proof; and

8. For such other and further relief as the court may deem just and proper, including costs and pre-judgment interest as provided in C.C.P. § 998, C.C.P. § 1032, and related provisions of law.

Dated: 12/18/16

BRAYTON❖PURCELL LLP

By: ______________________
David R. Donadio
Attorneys for Plaintiffs

# EXHIBIT A

# EXHIBIT A

Plaintiff's exposure to asbestos and asbestos-containing products occurred at various locations both inside and outside the State of California, including but not limited to:

| Employer | Location | Job Title | Dates |
|---|---|---|---|
| U.S. Navy | Naval Training Center San Diego, CA | Trainee | 7/10/1961-8/25/1961 |
| | | Electronics Technician (Student) | 11/2/1964-11/13/1964 |
| U.S. Navy | Naval Station Treasure Island San Francisco, CA | Student (Electronics Technician) | 10/10/1961-8/10/1962; 9/7/1963-11/1/1963 |
| U.S. Navy | OKANOGAN (APA-220) | Electronics Technician | 8/26/1962-10/21/1962; 10/26/1962-3/31/1963 |
| | Todd Shipyard San Pedro, CA | | 9/25/1962-10/4/1962 |
| U.S. Navy | U.S. Air Force Lackland AFB San Antonio, TX | Electronics Technician (Student) | 4/10/1963-6/18/1963 |
| U.S. Navy | ELDORADO (AGC-11) | Electronics Technician | 6/19/1963-9/7/1963; 11/2/1963-11/1/1964; 11/13/1964-1/14/1965 |
| | at: Long Beach Naval Shipyard Long Beach, CA | | 7/1/1963-11/1/1963 |
| U.S. Navy | Mare Island Naval Shipyard Vallejo, CA | Student (Nuclear Reactor Technician) | 1/14/1965-8/6/1965 |

///

///

EXHIBIT A

EXHIBIT A (cont'd.)

| Employer | Location | Job Title | Dates |
|---|---|---|---|
| U.S. Navy | AEC Idaho National Engineering Lab (USDOE) Idaho Falls, ID | Nuclear Reactor Technician (Trainee) | 8/19/1965-2/18/1966 (5 days/week) |
| | Atomic Energy Commission (AEC) Lawrence Berkeley Lab Berkeley, CA | | 8/19/1965-2/18/1966 (1 day/week) |
| U.S. Navy | ENTERPRISE (CVAN-65) | Nuclear Reactor Technician | 4/4/1966-7/19/1967 |
| | at: Hunters Point Naval Shipyard San Francisco, CA | | 7/1/1966-8/31/1966; 7/13/1967-7/19/1967 |
| | | Propulsion Plant Supervisor (Senior) | 3/18/1971-4/5/1972 |
| U.S. Navy | Norfolk Naval Shipyard Portsmouth, VA | Student | 8/14/1967-10/3/1967 |
| | FORRESTAL (CVA-59) | | (1 day) |
| U.S. Navy | Naval Air Station, Cecil Field Jacksonville/Yukon, FL | Electronics Technician | 10/5/1967-1/23/1969 |
| U.S. Navy | PUGET SOUND (AD-38) | Electronics Technician | 2/6/1970-2/1/1971 |
| U.S. Navy | NIMITZ (CVAN-68) at: Newport News Shipbuilding & Dry Dock Co. Newport News, VA | Electronics Technician (Chief) | 6/26/1972-10/16/1974; 10/22/1974-12/18/1974 |

EXHIBIT A

# EXHIBIT B

EXHIBIT B

Plaintiff retired from his last place of employment at regular retirement age.  He has therefore suffered no disability from his asbestos-related disease as "disability" is defined in California Code of Civil Procedure § 340.2.

Plaintiff's exposure to asbestos and asbestos-containing products caused severe and permanent injury to the plaintiff, including, but not limited to breathing difficulties, pleural disease, asbestosis, other lung damage, and/or cancer.  Plaintiff was diagnosed with mesothelioma on or about November 2018, and may have other asbestos-related diagnoses to be determined.

EXHIBIT B

POS-010

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:
David R. Donadio (State Bar # 154436)
Brayton<>Purcell
222 Rush Landing Rd., Novato, California 94948-6169
TELEPHONE NO.: (415) 898-1555 FAX NO. *(Optional)*: (415) 898-1247
E-MAIL ADDRESS *(Optional)*:
ATTORNEY FOR *(Name)*: Plaintiff(s)

FOR COURT USE ONLY

ELECTRONICALLY
FILED
*Superior Court of California, County of San Francisco*
01/15/2019
Clerk of the Court
BY: DAVID YUEN
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME:

PLAINTIFF/PETITIONER: Victor Halfon and Karen Halfon

DEFENDANT/RESPONDENT: Parker-Hannifin Corporation., et. al.

CASE NUMBER: CGC-18-276754

## PROOF OF SERVICE OF SUMMONS

Ref. No. or File No.: 1453

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. [X] summons
   b. [X] complaint
   c. [X] Alternative Dispute Resolution (ADR) package
   d. [X] Civil Case Cover Sheet *(served in complex cases only)*
   e. [ ] cross-complaint
   f. [X] other *(specify documents)*: Statement of Damages (2), Notice of Status Conference and Preliminary Fact Sheet
3. a. Party served *(specify name of party as shown on documents served)*:
   J.T. Thorpe & Son, Inc.

   b. [X] Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:
   Courtney Stephens, Authorized to Accept Service on behalf of Dentons US LLP, Inc., Authorized Agent for Service
4. Address where the party was served: One Market Plaza
   Spear Tower, 24th Floor
   San Francisco, CA 94105
5. I served the party *(check proper box)*
   a. [X] **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: 12/26/18 (2) at *(time)*: 12:37 PM
   b. [ ] **by substituted service.** On *(date)*: at *(time)*: I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3)*:

      (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

      (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

      (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date)*: from *(city)*: or [ ] a declaration of mailing is attached.

      (5) [ ] I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
POS-010 [Rev. January 1, 2007]

PROOF OF SERVICE OF SUMMONS

Code of Civil Procedure, § 417.10

*LexisNexis® Automated California Judicial Council Forms*

| PLAINTIFF/PETITIONER: J.T. Thorpe & Son, Inc. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Parker-Hannifin Corporation., et. al. | CGC-18-276754 |

5. c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

   (1) on *(date):* (2) from *(city):*

   (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.*)* (Code Civ. Proc., § 415.30.)

   (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

   d. ☐ **by other means** *(specify means of service and authorizing code section):*

   ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
   a. ☐ as an individual defendant.
   b. ☐ as the person sued under the fictitious name of *(specify):*
   c. ☐ as occupant.
   d. ☒ On behalf of *(specify):* J.T. Thorpe & Son, Inc.
   under the following Code of Civil Procedure section:

   ☒ 416.10 (corporation)
   ☐ 416.20 (defunct corporation)
   ☐ 416.30 (joint stock company/association)
   ☐ 416.40 (association or partnership)
   ☐ 416.50 (public entity)
   ☐ 415.95 (business organization, form unknown)
   ☐ 416.60 (minor)
   ☐ 416.70 (ward or conservatee)
   ☐ 416.90 (authorized person)
   ☐ 415.46 (occupant)
   ☐ other:

7. **Person who served papers**
   a. Name: Ryan Padilla
   b. Address: 222 Rush Landing Road, Novato, CA 94948
   c. Telephone number:
   d. **The fee for service was:** $
   e. I am:

   (1) ☒ not a registered California process server.
   (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
   (3) ☐ a registered California process server:
   (i) ☐ owner ☐ employee ☐ independent contractor.
   (ii) Registration No.:
   (iii) County:

8. ☒ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

   or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: 1/11/19

Ryan Padilla
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

(SIGNATURE)

POS-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
David R. Donadio (State Bar # 154436)
Brayton<>Purcell
222 Rush Landing Rd., Novato, California 94948-6169
TELEPHONE NO.: (415) 898-1555 FAX NO. (Optional): (415) 898-1247
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name): Plaintiff(s)

FOR COURT USE ONLY

ELECTRONICALLY **FILED**
*Superior Court of California, County of San Francisco*
**01/15/2019**
**Clerk of the Court**
BY: DAVID YUEN
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME:

PLAINTIFF/PETITIONER: Victor Halfon and Karen Halfon

DEFENDANT/RESPONDENT: Parker-Hannifin Corporation., et. al.

CASE NUMBER: CGC-18-276754

Ref. No. or File No.: 1453

## PROOF OF SERVICE OF SUMMONS

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. [X] summons
   b. [X] complaint
   c. [X] Alternative Dispute Resolution (ADR) package
   d. [X] Civil Case Cover Sheet *(served in complex cases only)*
   e. [ ] cross-complaint
   f. [X] other *(specify documents):* Statement of Damages (2), Notice of Status Conference and Preliminary Fact Sheet
3. a. Party served *(specify name of party as shown on documents served):*
   Parker-Hannifin Corporation

   b. [X] Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   Daisy Montenegro, Authorized to Accept Service on behalf of C T Corporation System, Authorized Agent for Service
4. Address where the party was served: 818 W. 7th St., Ste #930 Los Angeles, CA 90017-3407
5. I served the party *(check proper box)*
   a. [X] **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* 1/3/19 (2) at *(time):* 8:20 AM
   b. [ ] **by substituted service.** On *(date):* at *(time):* I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

      (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

      (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date):* from *(city):* or [ ] a declaration of mailing is attached.

      (5) [ ] I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
POS-010 [Rev. January 1, 2007]

PROOF OF SERVICE OF SUMMONS

Code of Civil Procedure, § 417.10

*LexisNexis® Automated California Judicial Council Forms*

| PLAINTIFF/PETITIONER: Victor Halfon and Karen Halfon | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Parker-Hannifin Corporation., et. al. | CGC-18-276754 |

5\. c. [ ] **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

(1) on *(date):* (2) from *(city):*

(3) [ ] with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.*)* (Code Civ. Proc., § 415.30.)

(4) [ ] to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. [ ] **by other means** *(specify means of service and authorizing code section):*

[ ] Additional page describing service is attached.

6\. The "Notice to the Person Served" (on the summons) was completed as follows:

a. [ ] as an individual defendant.

b. [ ] as the person sued under the fictitious name of *(specify):*

c. [ ] as occupant.

d. [X] On behalf of *(specify):* Parker-Hannifin Corporation

under the following Code of Civil Procedure section:

[X] 416.10 (corporation)
[ ] 416.20 (defunct corporation)
[ ] 416.30 (joint stock company/association)
[ ] 416.40 (association or partnership)
[ ] 416.50 (public entity)
[ ] 415.95 (business organization, form unknown)
[ ] 416.60 (minor)
[ ] 416.70 (ward or conservatee)
[ ] 416.90 (authorized person)
[ ] 415.46 (occupant)
[ ] other:

7\. **Person who served papers**

a. Name: Mark Valenti

b. Address: 5042 Wilshire Blvd. #507, Los Angeles, CA 90036

c. Telephone number: 213-487-4123

d. **The fee** for service was: $

e. I am:

(1) [ ] not a registered California process server.

(2) [ ] exempt from registration under Business and Professions Code section 22350(b).

(3) [X] a registered California process server:

(i) [X] owner [ ] employee [ ] independent contractor.

(ii) Registration No.: 2782

(iii) County: Los Angeles

8\. [X] **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

or

9\. [ ] **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: 1-4-19

Mark Valenti
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

(SIGNATURE)

POS-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address):
David R. Donadio (State Bar # 154436)
Brayton<>Purcell
222 Rush Landing Rd., Novato, California 94948-6169
TELEPHONE NO.: (415) 898-1555 FAX NO. (Optional): (415) 898-1247
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name): Plaintiff(s)

FOR COURT USE ONLY

ELECTRONICALLY **FILED**
Superior Court of California, County of San Francisco
**01/15/2019**
Clerk of the Court
BY:DAVID YUEN
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME:

PLAINTIFF/PETITIONER: Victor Halfon and Karen Halfon

DEFENDANT/RESPONDENT: Parker-Hannifin Corporation., et. al.

CASE NUMBER: CGC-18-276754

**PROOF OF SERVICE OF SUMMONS**

Ref. No. or File No.: 1453

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. [X] summons
   b. [X] complaint
   c. [X] Alternative Dispute Resolution (ADR) package
   d. [X] Civil Case Cover Sheet *(served in complex cases only)*
   e. [ ] cross-complaint
   f. [X] other *(specify documents):* Statement of Damages (2), Notice of Status Conference and Preliminary Fact Sheet
3. a. Party served *(specify name of party as shown on documents served):*
   Metropolitan Life Insurance Company
   b. [X] Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   Daisy Montenegro, Authorized to Accept Service on behalf of C T Corporation System, Authorized Agent for Service
4. Address where the party was served: 818 W. 7th St., Ste #930
   Los Angeles, CA 90017-3407
5. I served the party *(check proper box)*
   a. [X] **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* 1/3/19 (2) at *(time):* 8:20 AM
   b. [ ] **by substituted service.** On *(date):* at *(time):* I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*
      (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.
      (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.
      (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.
      (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date):* from *(city):* or [ ] a declaration of mailing is attached.
      (5) [ ] I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
POS-010 [Rev. January 1, 2007]

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10

LexisNexis® Automated California Judicial Council Forms

| PLAINTIFF/PETITIONER: Victor Halfon and Karen Halfon | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Parker-Hannifin Corporation., et. al. | CGC-18-276754 |

5. c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

   (1) on *(date):* (2) from *(city):*

   (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.*)* (Code Civ. Proc., § 415.30.)

   (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

   d. ☐ **by other means** *(specify means of service and authorizing code section):*

   ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
   a. ☐ as an individual defendant.
   b. ☐ as the person sued under the fictitious name of *(specify):*
   c. ☐ as occupant.
   d. ☒ On behalf of *(specify):* Metropolitan Life Insurance Company
   under the following Code of Civil Procedure section:

   ☒ 416.10 (corporation)
   ☐ 416.20 (defunct corporation)
   ☐ 416.30 (joint stock company/association)
   ☐ 416.40 (association or partnership)
   ☐ 416.50 (public entity)
   ☐ 415.95 (business organization, form unknown)
   ☐ 416.60 (minor)
   ☐ 416.70 (ward or conservatee)
   ☐ 416.90 (authorized person)
   ☐ 415.46 (occupant)
   ☐ other:

7. **Person who served papers**
   a. Name: Mark Valenti
   b. Address: 5042 Wilshire Blvd. #507, Los Angeles, CA 90036
   c. Telephone number: 213-487-4123
   d. **The fee** for service was: $
   e. I am:

   (1) ☐ not a registered California process server.
   (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
   (3) ☒ a registered California process server:
   (i) ☒ owner ☐ employee ☐ independent contractor.
   (ii) Registration No.: 2782
   (iii) County: Los Angeles

8. ☒ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

   or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: 1-4-19

Mark Valenti
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

▶ [signature]
(SIGNATURE)

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): David R. Donadio (State Bar # 154436) Brayton<>Purcell 222 Rush Landing Rd., Novato, California 94948-6169 TELEPHONE NO.: (415) 898-1555 FAX NO. (Optional): (415) 898-1247 E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): Plaintiff(s) | FOR COURT USE ONLY ELECTRONICALLY FILED Superior Court of California, County of San Francisco 01/15/2019 Clerk of the Court BY:DAVID YUEN Deputy Clerk |
|---|---|
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO STREET ADDRESS: 400 McAllister Street MAILING ADDRESS: CITY AND ZIP CODE: San Francisco, CA 94102 BRANCH NAME: | |
| PLAINTIFF/PETITIONER: Victor Halfon and Karen Halfon DEFENDANT/RESPONDENT: Parker-Hannifin Corporation., et. al. | CASE NUMBER: CGC-18-276754 |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.: 1453 |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. [X] summons
   b. [X] complaint
   c. [X] Alternative Dispute Resolution (ADR) package
   d. [X] Civil Case Cover Sheet *(served in complex cases only)*
   e. [ ] cross-complaint
   f. [X] other *(specify documents)*: Statement of Damages (2), Notice of Status Conference and Preliminary Fact Sheet
3. a. Party served *(specify name of party as shown on documents served)*:
   Honeywell International Inc. (for Honeywell Controls)

   b. [X] Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:
   Becky DeGeorge, Authorized to Accept Service on behalf of CSC - Lawyers Incorporating Service, Inc., Authorized Agent for Service
4. Address where the party was served: 2710 Gateway Oaks Drive, Suite 150N Sacramento, CA 95833
5. I served the party *(check proper box)*
   a. [X] **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date)*: 12/27/18 (2) at *(time)*: 12:26 PM
   b. [ ] **by substituted service.** On *(date)*: at *(time)*: I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3)*:

      (1) [ ] **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

      (2) [ ] **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) [ ] **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

      (4) [ ] I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date)*: from *(city)*: or [ ] a declaration of mailing is attached.

      (5) [ ] I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

Form Adopted for Mandatory Use Judicial Council of California POS-010 [Rev. January 1, 2007]

PROOF OF SERVICE OF SUMMONS

Code of Civil Procedure, § 417.10

LexisNexis® Automated California Judicial Council Forms

| PLAINTIFF/PETITIONER: Victor Halfon and Karen Halfon | CASE NUMBER: |
| --- | --- |
| DEFENDANT/RESPONDENT: Parker-Hannifin Corporation., et. al. | CGC-18-276754 |

5. c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

   (1) on *(date):* (2) from *(city):*

   (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.*)* (Code Civ. Proc., § 415.30.)

   (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

   d. ☐ **by other means** *(specify means of service and authorizing code section):*

   ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
   a. ☐ as an individual defendant.
   b. ☐ as the person sued under the fictitious name of *(specify):*
   c. ☐ as occupant.
   d. ☒ On behalf of *(specify):* Honeywell International Inc. (for Honeywell Controls)
   under the following Code of Civil Procedure section:

   ☒ 416.10 (corporation)
   ☐ 416.20 (defunct corporation)
   ☐ 416.30 (joint stock company/association)
   ☐ 416.40 (association or partnership)
   ☐ 416.50 (public entity)
   ☐ 415.95 (business organization, form unknown)
   ☐ 416.60 (minor)
   ☐ 416.70 (ward or conservatee)
   ☐ 416.90 (authorized person)
   ☐ 415.46 (occupant)
   ☐ other:

7. **Person who served papers**
   a. Name: Monica Lepe
   b. Address: 222 Rush Landing Road, Novato, CA 94948
   c. Telephone number:
   d. **The fee** for service was: $
   e. I am:

   (1) ☒ not a registered California process server.
   (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
   (3) ☐ a registered California process server:
   (i) ☐ owner ☐ employee ☐ independent contractor.
   (ii) Registration No.:
   (iii) County:

8. ☒ I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

   or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: 1/9/19

Monica Lepe
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

▶ *Monica Lepe*
(SIGNATURE)

DAVID R. DONADIO, ESQ., S.B. #154436
DDonadio@braytonlaw.com
BRAYTON❖PURCELL LLP
Attorneys at Law
222 Rush Landing Road
P.O. Box 6169
Novato, California 94948-6169
(415) 898-1555

Attorneys for Plaintiffs

ENDORSED
FILED
San Francisco County Superior Court
DEC 18 2018
CLERK OF THE COURT
BY: ROSSALY DE LA VEGA
Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

VICTOR HALFON and KAREN HALFON,

Plaintiffs,

vs.

PARKER-HANNIFIN CORPORATION, et al.,

Defendants.

ASBESTOS No. CGC-18-276754

PRELIMINARY FACT SHEET/NEW FILING/ASBESTOS LITIGATION

(See Case Management Order, Filed June 29, 2012)

NOTICE

TO NEW DEFENDANTS SERVED IN COMPLEX ASBESTOS LITIGATION IN THE SUPERIOR COURT IN AND FOR THE STATE OF CALIFORNIA, CITY AND COUNTY OF SAN FRANCISCO

You have been served with process in an action which has been designated by the Court as complex litigation pursuant to Standard 19 of the Standards of Judicial Administration. This litigation bears the caption "In Re: Complex Asbestos Litigation", [San Francisco Superior Court No. 828684].

This litigation is governed by the Case Management Order, filed with this court on June 29, 2012, some of which affect the judicial management and/or discovery obligations, including the responsibility to answer interrogatories deemed propounded in the case. You may contact the Court or Designated Defense Counsel, Spanos Przetak, 475 14th Street, Suite 550, Oakland, California 94512; Telephone: (510) 850-0200; FAX: (510) 380-6354, for further information and/or copies of these orders, at your expense.

///

///

BRAYTON❖PURCELL LLP
ATTORNEYS AT LAW
222 RUSH LANDING ROAD
P O BOX 6169
NOVATO, CALIFORNIA 94948-6169
(415) 898-1555

1. State the complete name and address of each person whose claimed exposure to asbestos is the basis of this lawsuit ("exposed person"): Victor Halfon, 690 Chestnut Street # 207, San Francisco, California 94133.

2. Does plaintiff anticipate filing a motion for a preferential trial date within the next four months? __X__ Yes ______ No

3. Date of birth of each exposed person in item one and, if applicable, date of death:

Date of Birth: 5/12/43

Date of Death: N/A

Social Security Number of each exposed person:

Social Security Numbers are confidential pursuant to Calif. Rule of Court 1.20.

4. Specify the nature or type of asbestos-related disease alleged by each exposed person.

_____ Asbestosis __X__ Mesothelioma

_____ Pleural Thickening/Plaques _____ Other Cancer: Specify: _________

_____ Lung Cancer Other Than Mesothelioma _____ Other: Specify: _________

5. For purposes of identifying the nature of exposure allegations involved in this action, please check one or more:

_____ Shipyard _____ Construction _____ Friction-Automotive

_____ Premises _____ Aerospace __X__ Military

_____ Other: Specify all that apply: ______________________________

6. If applicable, indicate which exposure allegations apply to which exposed person.

7. Identify each location alleged to be a source of an asbestos exposure, and to the extent known, provide the beginning and ending year(s) of each such exposure. Also specify each exposed person's employer and job title or job description during each period of exposure. (For example: "San Francisco Naval Shipyard - Pipefitter - 1939-1948"). Examples of locations of exposure might be a specific shipyard, a specific railroad maintenance yard, or perhaps more generalized descriptions such as "merchant marine" or "construction". If an exposed person claims exposure

///

during only a portion of a year, the answer should indicate that year as the beginning and ending year (e.g., 1947-1947).

| Employer | Location | Job Title | Dates |
|---|---|---|---|
| U.S. Navy | Naval Training Center San Diego, CA | Trainee | 7/10/1961-8/25/1961 |
| | | Electronics Technician (Student) | 11/2/1964-11/13/1964 |
| U.S. Navy | Naval Station Treasure Island San Francisco, CA | Student (Electronics Technician) | 10/10/1961-8/10/1962; 9/7/1963-11/1/1963 |
| U.S. Navy | OKANOGAN (APA-220) | Electronics Technician | 8/26/1962-10/21/1962; 10/26/1962-3/31/1963 |
| | Todd Shipyard San Pedro, CA | | 9/25/1962-10/4/1962 |
| U.S. Navy | U.S. Air Force Lackland AFB San Antonio, TX | Electronics Technician (Student) | 4/10/1963-6/18/1963 |

(Attach Additional Pages, If Necessary) SEE ATTACHED CONTINUATION

8. For each exposed person who:

a. worked in the United States or for a U.S. agency outside the territorial United States, attach to the copy of this fact sheet provided to Designated Defense Counsel a fully executed Social Security Earnings authorization (Exhibit I to Case Management Order dated June 29, 2012);

b. may have had a Social Security disability award or is no longer employed and whose last employment was not with a United States government agency, attach to the copy of this fact sheet provided to Designated Defense Counsel a fully executed Social Security Disability authorization (Exhibit I to Case Management Order dated June 29, 2012);

c. served at any time in the United States military, attach to the copy of this fact sheet provided to Designated Defense Counsel two fully executed originals of the stipulation (Exhibit I to Case Management Order dated June 29, 2012);

d. was employed by the United States government in a civilian capacity, attach to the copy of this fact sheet provided to Designated Defense Counsel two fully executed originals of the stipulation (Exhibit I to Case Management Order dated June 29, 2012);

9. If there is a wrongful death claim, attach to the copy of this fact sheet provided to Designated Defense Counsel a copy of the death certificate, if available. If an autopsy report was done, also attach a copy of it to the copy of this fact sheet provided to Designated Defense Counsel.

Dated: 12/18/2018

BRAYTON❖PURCELL LLP

By: [signature]
David R. Donadio
Attorneys for Plaintiffs

| Employer | Location | Job Title | Dates |
|---|---|---|---|
| U.S. Navy | ELDORADO (AGC-11) | Electronics Technician | 6/19/1963-9/7/1963; 11/2/1963-11/1/1964; 11/13/1964-1/14/1965 |
| | at: Long Beach Naval Shipyard Long Beach, CA | | 7/1/1963-11/1/1963 |
| U.S. Navy | Mare Island Naval Shipyard Vallejo, CA | Student (Nuclear Reactor Technician) | 1/14/1965-8/6/1965 |
| U.S. Navy | AEC Idaho National Engineering Lab (USDOE) Idaho Falls, ID | Nuclear Reactor Technician (Trainee) | 8/19/1965-2/18/1966 (5 days/week) |
| | Atomic Energy Commission (AEC) Lawrence Berkeley Lab Berkeley, CA | | 8/19/1965-2/18/1966 (1 day/week) |
| U.S. Navy | ENTERPRISE (CVAN-65) | Nuclear Reactor Technician | 4/4/1966-7/19/1967 |
| | at: Hunters Point Naval Shipyard San Francisco, CA | | 7/1/1966-8/31/1966; 7/13/1967-7/19/1967 |
| | | Propulsion Plant Supervisor (Senior) | 3/18/1971-4/5/1972 |
| U.S. Navy | Norfolk Naval Shipyard Portsmouth, VA | Student | 8/14/1967-10/3/1967 |
| | FORRESTAL (CVA-59) | | (1 day) |
| U.S. Navy | Naval Air Station, Cecil Field Jacksonville/Yukon, FL | Electronics Technician | 10/5/1967-1/23/1969 |
| U.S. Navy | PUGET SOUND (AD-38) | Electronics Technician | 2/6/1970-2/1/1971 |

| Employer | Location | Job Title | Dates |
|---|---|---|---|
| U.S. Navy | NIMITZ (CVAN-68) at: Newport News Shipbuilding & Dry Dock Co. Newport News, VA | Electronics Technician (Chief) | 6/26/1972-10/16/1974; 10/22/1974-12/18/1974 |

CASE NUMBER: CGC-18-276754 VICTOR HALFON ET AL VS. PARKER-HANNIFIN CORPORA

# NOTICE TO PLAINTIFF

A Case Management Conference is set for:

**DATE:** **DEC-19-2019**

**TIME:** **1:30PM**

**PLACE:** **Department 503**
**400 McAllister Street**
**San Francisco, CA 94102-3680**

**All parties must appear and comply with California Rules of Court 3.110**

**CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.**

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**